## ALLEN ET AL. *v.* McCURRY

No. 79–935.   Argued October 8, 1980—Decided December 9, 1980

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, REHNQUIST, and STEVENS, JJ., joined. BLACKMUN,

J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 105.

*John J. FitzGibbon* argued the cause for petitioners. With him on the briefs were *Eugene P. Freeman* and *Robert H. Dierker, Jr.*

*Jeffrey J. Shank* argued the cause and filed a brief for respondent.*

JUSTICE STEWART delivered the opinion of the Court.

At a hearing before his criminal trial in a Missouri court, the respondent, Willie McCurry, invoked the Fourth and Fourteenth Amendments to suppress evidence that had been seized by the police. The trial court denied the suppression motion in part, and McCurry was subsequently convicted after a jury trial. The conviction was later affirmed on appeal. *State v. McCurry,* 587 S. W. 2d 337 (Mo. App. 1979). Because he did not assert that the state courts had denied him a "full and fair opportunity" to litigate his search and seizure claim, McCurry was barred by this Court's decision in *Stone v. Powell,* 428 U. S. 465, from seeking a writ of habeas corpus in a federal district court. Nevertheless, he sought federal-court redress for the alleged constitutional violation by bringing a damages suit under 42 U. S. C. § 1983 against the officers who had entered his home and seized the evidence in question. We granted certiorari to consider whether the unavailability of federal habeas corpus prevented the police officers from raising the state courts' partial rejection of McCurry's constitutional claim as a collateral estoppel defense to the § 1983 suit against them for damages. 444 U. S. 1070.

*Stephen H. Sachs,* Attorney General of Maryland, *Emory A. Plitt, Jr.,* Assistant Attorney General, *George P. Agnost, Fred E. Inbau, Wayne W. Schmidt,* and *James P. Manak* filed a brief for ʾAmericans for Effective Law Enforcement, Inc., et al., as *amici curiae* urging reversal.

*Michael A. Wolff* filed a brief for the American Civil Liberties Union of Eastern Missouri as *amicus curiae.*

I

In April 1977, several undercover police officers, following an informant's tip that McCurry was dealing in heroin, went to his house in St. Louis, Mo., to attempt a purchase.[1] Two officers, petitioners Allen and Jacobsmeyer, knocked on the front door, while the other officers hid nearby. When McCurry opened the door, the two officers asked to buy some heroin "caps." McCurry went back into the house and returned soon thereafter, firing a pistol at and seriously wounding Allen and Jacobsmeyer. After a gun battle with the other officers and their reinforcements, McCurry retreated into the house; he emerged again when the police demanded that he surrender. Several officers then entered the house without a warrant, purportedly to search for other persons inside. One of the officers seized drugs and other contraband that lay in plain view, as well as additional contraband he found in dresser drawers and in auto tires on the porch.

McCurry was charged with possession of heroin and assault with intent to kill. At the pretrial suppression hearing, the trial judge excluded the evidence seized from the dresser drawers and tires, but denied suppression of the evidence found in plain view. McCurry was convicted of both the heroin and assault offenses.

McCurry subsequently filed the present § 1983 action for $1 million in damages against petitioners Allen and Jacobsmeyer, other unnamed individual police officers, and the city of St. Louis and its police department. The complaint alleged a conspiracy to violate McCurry's Fourth Amendment rights, an unconstitutional search and seizure of his house, and an assault on him by unknown police officers after he had been arrested and handcuffed. The petitioners moved for summary judgment. The District Court apparently under-

---

[1] The facts are drawn from the Court of Appeals' opinion. 606 F. 2d 795 (CA8 1979).

stood the gist of the complaint to be the allegedly unconstitutional search and seizure and granted summary judgment, holding that collateral estoppel prevented McCurry from relitigating the search-and-seizure question already decided against him in the state courts. 466 F. Supp. 514 (ED Mo. 1978).[2]

The Court of Appeals reversed the judgment and remanded the case for trial. 606 F. 2d 795 (CA8 1979).[3] The appellate court said it was not holding that collateral estoppel was generally inapplicable in a § 1983 suit raising issues determined against the federal plaintiff in a state criminal trial. *Id.*, at 798. But noting that *Stone* v. *Powell, supra,* barred McCurry from federal habeas corpus relief, and invoking "the special role of the federal courts in protecting civil rights," 606 F. 2d, at 799, the court concluded that the § 1983 suit was McCurry's only route to a federal forum for his

---

[2] The merits of the Fourth Amendment claim are discussed in the opinion of the Missouri Court of Appeals. *State* v. *McCurry,* 587 S. W. 2d 337 (1979). The state courts upheld the entry of the house as a reasonable response to emergency circumstances, but held illegal the seizure of any evidence discovered as a result of that entry except what was in plain view. *Id.*, at 340. McCurry therefore argues here that even if the doctrine of collateral estoppel generally applies to this case, he should be able to proceed to trial to obtain damages for the part of the seizure declared illegal by the state courts. The petitioners contend, on the other hand, that the complaint alleged essentially an illegal entry, adding that only the entry could possibly justify the $1 million prayer. Since the state courts upheld the entry, the petitioners argue that if collateral estoppel applies here at all, it removes from trial all issues except the alleged assault. The United States Court of Appeals, however, addressed only the broad question of the applicability of collateral estoppel to § 1983 suits brought by plaintiffs in McCurry's circumstances, and questions as to the scope of collateral estoppel with respect to the particular issues in this case are not now before us.

[3] Beyond holding that collateral estoppel does not apply in this case, the Court of Appeals noted that the District Court had overlooked the conspiracy and assault charges. 606 F. 2d, at 797, and n. 1.

constitutional claim and directed the trial court to allow him to proceed to trial unencumbered by collateral estoppel.[4]

## II

The federal courts have traditionally adhered to the related doctrines of res judicata and collateral estoppel. Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Cromwell* v. *County of Sac*, 94 U. S. 351, 352. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case. *Montana* v. *United States*, 440 U. S. 147, 153.[5] As this Court and other courts have often recognized, res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication. *Id.*, at 153–154.

In recent years, this Court has reaffirmed the benefits of collateral estoppel in particular, finding the policies underlying it to apply in contexts not formerly recognized at common law. Thus, the Court has eliminated the requirement of mutuality in applying collateral estoppel to bar relitiga-

---

[4] Nevertheless, relying on the doctrine of *Younger* v. *Harris*, 401 U. S. 37, the Court of Appeals directed the District Court to abstain from conducting the trial until McCurry had exhausted his opportunities for review of his claim in the state appellate courts. 606 F. 2d, at 799.

[5] The Restatement of Judgments now speaks of res judicata as "claim preclusion" and collateral estoppel as "issue preclusion." Restatement (Second) of Judgments § 74 (Tent. Draft No. 3, Apr. 15, 1976). Some courts and commentators use "res judicata" as generally meaning both forms of preclusion.

Contrary to a suggestion in the dissenting opinion, *post*, at 113, n. 12, this case does not involve the question whether a § 1983 claimant can litigate in federal court an issue he might have raised but did not raise in previous litigation.

tion of issues decided earlier in federal-court suits, *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation*, 402 U. S. 313, and has allowed a litigant who was not a party to a federal case to use collateral estoppel "offensively" in a new federal suit against the party who lost on the decided issue in the first case, *Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322.[6] But one general limitation the Court has repeatedly recognized is that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a "full and fair opportunity" to litigate that issue in the earlier case. *Montana* v. *United States, supra*, at 153; *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation, supra*, at 328–329.[7]

The federal courts generally have also consistently accorded preclusive effect to issues decided by state courts. *E. g.*, *Montana* v. *United States, supra; Angel* v. *Bullington*, 330 U. S. 183. Thus, res judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance on ad-

---

[6] In *Blonder-Tongue* the Court noted other trends in the state and federal courts expanding the preclusive effects of judgments, such as the broadened definition of "claim" in the context of res judicata and the greater preclusive effect given criminal judgments in subsequent civil cases. 402 U. S., at 326.

[7] Other factors, of course, may require an exception to the normal rules of collateral estoppel in particular cases. *E. g.*, *Montana* v. *United States*, 440 U. S., at 162 (unmixed questions of law in successive actions between the same parties on unrelated claims).

Contrary to the suggestion of the dissent, *post*, at 112–113, our decision today does not "fashion" any new, more stringent doctrine of collateral estoppel, nor does it hold that the collateral-estoppel effect of a state-court decision turns on the single factor of whether the State gave the federal claimant a full and fair opportunity to litigate a federal question. Our decision does not "fashion" any doctrine of collateral estoppel at all. Rather, it construes § 1983 to determine whether the conventional doctrine of collateral estoppel applies to the case at hand. It must be emphasized that the question whether any exceptions or qualifications within the bounds of that doctrine might ultimately defeat a collateral-estoppel defense in this case is not before us. See n. 2, *supra*.

judication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system. See *Younger* v. *Harris,* 401 U. S. 37, 43–45.

Indeed, though the federal courts may look to the common law or to the policies supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so:

"[J]udicial proceedings [of any court of any State] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State . . . ."   28 U. S. C. § 1738.[8]

*Huron Holding Corp.* v. *Lincoln Mine Operating Co.,* 312 U. S. 183, 193; *Davis* v. *Davis,* 305 U. S. 32, 40.   It is against this background that we examine the relationship of § 1983 and collateral estoppel, and the decision of the Court of Appeals in this case.

### III

This Court has never directly decided whether the rules of res judicata and collateral estoppel are generally applicable to § 1983 actions.   But in *Preiser* v. *Rodriguez,* 411 U. S. 475, 497, the Court noted with implicit approval the view of other federal courts that res judicata principles fully apply to civil rights suits brought under that statute.   See also *Huffman* v. *Pursue, Ltd.,* 420 U. S. 592, 606, n. 18; *Wolff* v.

---

[8] This statute has existed in essentially unchanged form since its enactment just after the ratification of the Constitution, Act of May 26, 1790, ch. 11, 1 Stat. 122, and its re-enactment soon thereafter, Act of Mar. 27, 1804, ch. 56, 2 Stat. 298–299.   Congress has also provided means for authenticating the records of the state proceedings to which the federal courts are to give full faith and credit.   28 U. S. C. § 1738.

*McDonnell,* 418 U. S. 539, 554, n. 12.[9]   And the virtually unanimous view of the Courts of Appeals since *Preiser* has been that § 1983 presents no categorical bar to the application of res judicata and collateral estoppel concepts.[10]   These federal appellate court decisions have spoken with little explanation or citation in assuming the compatibility of § 1983 and rules of preclusion, but the statute and its legislative history clearly support the courts' decisions.

Because the requirement of mutuality of estoppel was still alive in the federal courts until well into this century, see *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation, supra,* at 322–323, the drafters of the 1871 Civil Rights Act, of which § 1983 is a part, may have had less reason to concern themselves with rules of preclusion than a modern Congress would.   Nevertheless, in 1871 res judicata and collateral estoppel could certainly have applied in federal suits following state-court litigation between the same parties or their privies, and nothing in the language of § 1983 remotely expresses any congressional intent to contravene the common-law rules of preclusion or to repeal the express stat-

---

[9] The cases noted in *Preiser* applied res judicata to issues decided both in state civil proceedings, *e. g., Coogan* v. *Cincinnati Bar Assn.,* 431 F. 2d 1209, 1211 (CA6 1970), and state criminal proceedings, *e. g., Goss* v. *Illinois,* 312 F. 2d 257, 259 (CA7 1963).

[10] *E. g., Robbins* v. *District Court,* 592 F. 2d 1015 (CA8 1979); *Jennings* v. *Caddo Parish School Bd.,* 531 F. 2d 1331 (CA5 1976); *Lovely* v. *Laliberte,* 498 F. 2d 1261 (CA1 1974); *Brown* v. *Georgia Power Co.,* 491 F. 2d 117 (CA5 1974); *Tang* v. *Appellate Division,* 487 F. 2d 138 (CA2 1973).

A very few courts have suggested that the normal rules of claim preclusion should not apply in § 1983 suits in one peculiar circumstance: Where a § 1983 plaintiff seeks to litigate in federal court a federal issue which he could have raised but did not raise in an earlier state-court suit against the same adverse party. *Graves* v. *Olgiati,* 550 F. 2d 1327 (CA2 1977); *Lombard* v. *Board of Ed. of New York City,* 502 F. 2d 631 (CA2 1974); *Mack* v. *Florida Bd. of Dentistry,* 430 F. 2d 862 (CA5 1970). These cases present a narrow question not now before us, and we intimate no view as to whether they were correctly decided.

utory requirements of the predecessor of 28 U. S. C. § 1738, see n. 8, *supra.* Section 1983 creates a new federal cause of action.[11] It says nothing about the preclusive effect of state-court judgments.[12]

Moreover, the legislative history of § 1983 does not in any clear way suggest that Congress intended to repeal or restrict the traditional doctrines of preclusion. The main goal of the Act was to override the corrupting influence of the Ku Klux Klan and its sympathizers on the governments and law enforcement agencies of the Southern States, see *Monroe* v. *Pape,* 365 U. S. 167, 174, and of course the debates show that one strong motive behind its enactment was grave congressional concern that the state courts had been deficient in

[11] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U. S. C. § 1983.

It has been argued that, since there remains little federal common law after *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, to hold that the creation of a federal cause of action by itself does away with the rules of preclusion would take away almost all meaning from § 1738. Currie, Res Judicata: The Neglected Defense, 45 U. Chi. L. Rev. 317, 328 (1978).

[12] By contrast, the roughly contemporaneous statute extending the federal writ of habeas corpus to state prisoners expressly rendered "null and void" any state-court proceeding inconsistent with the decision of a federal habeas court, Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385, 386 (current version at 28 U. S. C. § 2254), and the modern habeas statute also expressly adverts to the effect of state-court criminal judgments by requiring the applicant for the writ to exhaust his state-court remedies, 28 U. S. C. § 2254 (b), and by presuming a state-court resolution of a factual issue to be correct except in eight specific circumstances, § 2254 (d). In any event, the traditional exception to res judicata for habeas corpus review, see *Preiser* v. *Rodriguez,* 411 U. S. 475, 497, provides no analogy to § 1983 cases, since that exception finds its source in the unique purpose of habeas corpus—to release the applicant for the writ from unlawful confinement. *Sanders* v. *United States,* 373 U. S. 1, 8.

protecting federal rights, *Mitchum* v. *Foster*, 407 U. S. 225, 241–242; *Monroe* v. *Pape, supra,* at 180.[13]   But in the context of the legislative history as a whole, this congressional concern lends only the most equivocal support to any argument that, in cases where the state courts have recognized the constitutional claims asserted and provided fair procedures for determining them, Congress intended to override § 1738 or the common-law rules of collateral estoppel and res judicata.   Since repeals by implication are disfavored, *Radzanower* v. *Touche Ross & Co.,* 426 U. S. 148, 154, much clearer support than this would be required to hold that § 1738 and the traditional rules of preclusion are not applicable to § 1983 suits.

As the Court has understood the history of the legislation, Congress realized that in enacting § 1983 it was altering the balance of judicial power between the state and federal courts.   See *Mitchum* v. *Foster, supra,* at 241.   But in doing so, Congress was adding to the jurisdiction of the federal courts, not subtracting from that of the state courts.   See *Monroe* v. *Pape, supra,* at 183 ("The federal remedy is supplementary to the state remedy . . .").[14]   The debates contain several references to the concurrent jurisdiction of the state courts over federal questions,[15] and numerous sugges-

[13] See, *e. g.,* Cong. Globe, 42d Cong., 1st Sess., 374–376 (1871) (Rep. Lowe); *id.,* at 394 (Rep. Rainey); *id.,* at 653 (Sen. Osborn).

[14] To the extent that Congress in the post-Civil War period did intend to deny full faith and credit to state-court decisions on constitutional issues, it expressly chose the very different means of postjudgment removal for state-court defendants whose civil rights were threatened by biased state courts and who therefore "are denied or cannot enforce [their civil rights] in the courts or judicial tribunals of the State." Act of Apr. 9, 1866, ch. 31, § 3, 14 Stat. 27.

[15] *E. g.,* Cong. Globe, 42d Cong., 1st Sess., 514 (1871) (Rep. Poland); *id.,* at 695 (Sen. Edmunds); see *Martinez* v. *California,* 444 U. S. 277, 283–284, n. 7 (noting that the state courts may entertain § 1983 claims, while reserving the question whether the state courts must do so).

tions that the state courts would retain their established jurisdiction so that they could, when the then current political passions abated, demonstrate a new sensitivity to federal rights.[16]

To the extent that it did intend to change the balance of power over federal questions between the state and federal courts, the 42d Congress was acting in a way thoroughly consistent with the doctrines of preclusion. In reviewing the legislative history of § 1983 in *Monroe* v. *Pape, supra,* the Court inferred that Congress had intended a federal remedy in three circumstances: where state substantive law was facially unconstitutional, where state procedural law was

---

[16] Senator Edmunds, the floor manager of the bill in the Senate, observed at the end of the debates:

"The bill, like all bills of this character, in its first and second sections, is a declaration of rights and a provision for the punishment of conspiracies against constitutional rights, and a redress for wrongs. It does not undertake to overthrow any court. . . . It does not undertake to interpose itself out of the regular order of the administration of law. It does not attempt to deprive any State of the honor which is due the punishment of crime. It is a law acting upon the citizen like every other law, and it is a law to be enforced by the courts through the regular and ordinary processes of judicial administration, and in no other way, until forcible resistance shall be offered to the quiet and ordinary course of justice." Cong. Globe, 42d Cong., 1st Sess., 697–698 (1871).

Representative Coburn expressed his belief that after passage of the Act "the tumbling and tottering States will spring up and resume the long-neglected administration of law in their own courts, giving, as they ought, themselves, equal protection to all." *Id.,* at 460. Representative Sheldon noted:

"Convenience and courtesy to the States suggest a sparing use [of national authority] and never so far as to supplant the State authority except in cases of extreme necessity, and when the State governments criminally refuse or neglect those duties which are imposed on them. . . . It seems to me to be sufficient, and at the same time to be proper, to make a permanent law affording to every citizen a remedy in the United States courts for injuries to him in those rights declared and guaranteed by the Constitution. . . ." *Id.,* at 368.

inadequate to allow full litigation of a constitutional claim, and where state procedural law, though adequate in theory, was inadequate in practice. 365 U. S., at 173–174. In short, the federal courts could step in where the state courts were unable or unwilling to protect federal rights. *Id.*, at 176. This understanding of § 1983 might well support an exception to res judicata and collateral estoppel where state law did not provide fair procedures for the litigation of constitutional claims, or where a state court failed to even acknowledge the existence of the constitutional principle on which a litigant based his claim. Such an exception, however, would be essentially the same as the important general limit on rules of preclusion that already exists: Collateral estoppel does not apply where the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court. See *supra*, at 95. But the Court's view of § 1983 in *Monroe* lends no strength to any argument that Congress intended to allow relitigation of federal issues decided after a full and fair hearing in a state court simply because the state court's decision may have been erroneous.[17]

---

[17] The dissent suggests, *post*, at 112, that the Court's decision in *England* v. *Medical Examiners*, 375 U. S. 411, demonstrates the impropriety of affording preclusive effect to the state-court decision in this case. The *England* decision is inapposite to the question before us. In the *England* case, a party first submitted to a federal court his claim that a state statute violated his constitutional rights. The federal court abstained and remitted the plaintiff to the state courts, holding that a state-court decision that the statute did not apply to the plaintiff would moot the federal question. *Id.*, at 413. The plaintiff submitted both the state- and federal-law questions to the state courts, which decided both questions adversely to him. *Id.*, at 414. This Court held that in such a circumstance, a plaintiff who properly reserved the federal issue by informing the state courts of his intention to return to federal court, if necessary, was not precluded from litigating the federal question in federal court. The holding in *England* depended entirely on this Court's view of the purpose of abstention in such a case: Where a plaintiff properly invokes federal-

The Court of Appeals in this case acknowledged that every Court of Appeals that has squarely decided the question has held that collateral estoppel applies when § 1983 plaintiffs attempt to relitigate in federal court issues decided against them in state criminal proceedings.[18] But the court noted that the only two federal appellate decisions invoking collateral estoppel to bar relitigation of Fourth Amendment claims decided adversely to the § 1983 plaintiffs in state courts came before this Court's decision in *Stone* v. *Powell,* 428 U. S. 465.[19] It also noted that some of the decisions hold-

---

court jurisdiciton in the first instance on a federal claim, the federal court has a duty to accept that jurisdiction. *Id.,* at 415. Abstention may serve only to postpone, rather than to abdicate, jurisdiction, since its purpose is to determine whether resolution of the federal question is even necessary, or to obviate the risk of a federal court's erroneous construction of state law. *Id.,* at 416, and n. 7. These concerns have no bearing whatsoever on the present case.

[18] *E. g., Fernandez* v. *Trias Monge,* 586 F. 2d 848, 854 (CA1 1978); *Wiggins* v. *Murphy,* 576 F. 2d 572, 573 (CA4 1978); *Martin* v. *Delcambre,* 578 F. 2d 1164, 1165 (CA5 1978); *Winters* v. *Lavine,* 574 F. 2d 46, 58 (CA2 1978); *Metros* v. *United States District Court,* 441 F. 2d 313 (CA10 1971); *Kauffman* v. *Moss,* 420 F. 2d 1270, 1274 (CA3 1970); *Mulligan* v. *Schlachter,* 389 F. 2d 231, 233 (CA6 1968).

Dictum in *Ney* v. *California,* 439 F. 2d 1285, 1288 (CA9 1971), suggested that applying collateral estoppel in § 1983 actions might make the Civil Rights Act "a dead letter," but in that case, because the state prosecutor had agreed to withdraw the evidence allegedly seized in violation of the Fourth Amendment, the state court had never decided the constitutional claim. In *Brubaker* v. *King,* 505 F. 2d 534, 537–538 (1974), the Court of Appeals for the Seventh Circuit held that since the issues in the state and federal cases were different—the legality of police conduct in the former and the good faith of the police in the latter—the state decision could not have preclusive effect in the federal court. This solution, however, fails to recognize that a state-court decision that the police acted legally cannot but foreclose a claim that they acted in bad faith. At least one Federal District Court has relied on the *Brubaker* case. *Clark* v. *Lutcher,* 436 F. Supp. 1266 (MD Pa. 1977).

[19] *Metros* v. *United States District Court, supra; Mulligan* v. *Schlachter, supra.*

ing collateral estoppel applicable to § 1983 actions were based at least in part on the estopped party's access to another federal forum through habeas corpus.[20] The Court of Appeals thus concluded that since *Stone* v. *Powell* had removed McCurry's right to a hearing of his Fourth Amendment claim in federal habeas corpus, collateral estoppel should not deprive him of a federal judicial hearing of that claim in a § 1983 suit.

*Stone* v. *Powell* does not provide a logical doctrinal source for the court's ruling. This Court in *Stone* assessed the costs and benefits of the judge-made exclusionary rule within the boundaries of the federal courts' statutory power to issue writs of habeas corpus, and decided that the incremental deterrent effect that the issuance of the writ in Fourth Amendment cases might have on police conduct did not justify the cost the writ imposed upon the fair administration of criminal justice. 428 U. S., at 489–496. The *Stone* decision concerns only the prudent exercise of federal-court jurisdiction under 28 U. S. C. § 2254. It has no bearing on § 1983 suits or on the question of the preclusive effect of state-court judgments.

The actual basis of the Court of Appeals' holding appears to be a generally framed principle that every person asserting a federal right is entitled to one unencumbered opportunity to litigate that right in a federal district court, regardless of the legal posture in which the federal claim arises. But the authority for this principle is difficult to discern. It cannot lie in the Constitution, which makes no such guarantee, but leaves the scope of the jurisdiction of the federal district courts to the wisdom of Congress.[21] And no such authority is to be found in § 1983 itself. For reasons already discussed at length, nothing in the language or legislative history of

---

[20] *E. g., Rimmer* v. *Fayetteville Police Department,* 567 F. 2d 273, 276 (CA4 1977); *Thistlewaite* v. *City of New York,* 497 F. 2d 339, 343 (CA2 1973); *Alexander* v. *Emerson,* 489 F. 2d 285, 286 (CA5 1973).

[21] U. S. Const., Art. III.

§ 1983 proves any congressional intent to deny binding effect to a state-court judgment or decision when the state court, acting within its proper jurisdiction, has given the parties a full and fair opportunity to litigate federal claims, and thereby has shown itself willing and able to protect federal rights. And nothing in the legislative history of § 1983 reveals any purpose to afford less deference to judgments in state criminal proceedings than to those in state civil proceedings.[22] There is, in short, no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all.[23]

Through § 1983, the 42d Congress intended to afford an opportunity for legal and equitable relief in a federal court for certain types of injuries. It is difficult to believe that the drafters of that Act considered it a substitute for a federal writ of habeas corpus, the purpose of which is not to redress civil injury, but to release the applicant from unlawful physical confinement, *Preiser* v. *Rodriguez*, 411 U. S., at 484; *Fay* v. *Noia*, 372 U. S. 391, 399, n. 5,[24] particularly in light of the

---

[22] The remarks of the proponents of § 1983 quoted in n. 16, *supra*, suggest the contrary. The Court of Appeals did not in any degree rest its holding on disagreement with the common view that judgments in criminal proceedings as well as in civil proceedings are entitled to preclusive effect. See, *e. g., Emich Motors Corp.* v. *General Motors Corp.*, 340 U. S. 558.

[23] The Court of Appeals did not suggest that the prospect of collateral estoppel in a § 1983 suit would deter a defendant in a state criminal case from raising Fourth Amendment claims, and it is difficult to imagine a defendant risking conviction and imprisonment because he hoped to win a later civil judgment based upon an allegedly illegal search and seizure.

[24] Under the modern statute, federal habeas corpus is bounded by a requirement of exhaustion of state remedies and by special procedural rules, 28 U. S. C. § 2254, which have no counterparts in § 1983, and which therefore demonstrate the continuing illogic of treating federal habeas and § 1983 suits as fungible remedies for constitutional violations.

extremely narrow scope of federal habeas relief for state prisoners in 1871.

The only other conceivable basis for finding a universal right to litigate a federal claim in a federal district court is hardly a legal basis at all, but rather a general distrust of the capacity of the state courts to render correct decisions on constitutional issues. It is ironic that *Stone* v. *Powell* provided the occasion for the expression of such an attitude in the present litigation, in view of this Court's emphatic reaffirmation in that case of the constitutional obligation of the state courts to uphold federal law, and its expression of confidence in their ability to do so. 428 U. S., at 493–494, n. 35; see *Robb* v. *Connolly*, 111 U. S. 624, 637 (Harlan, J.).

The Court of Appeals erred in holding that McCurry's inability to obtain federal habeas corpus relief upon his Fourth Amendment claim renders the doctrine of collateral estoppel inapplicable to his § 1983 suit.[25] Accordingly, the judgment is reversed, and the case is remanded to the Court of Appeals for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The legal principles with which the Court is concerned in this civil case obviously far transcend the ugly facts of respondent's criminal convictions in the courts of Missouri for heroin possession and assault.

The Court today holds that notions of collateral estoppel apply with full force to this suit brought under 42 U. S. C. § 1983. In my view, the Court, in so ruling, ignores the clear import of the legislative history of that statute and disregards the important federal policies that underlie its

---

[25] We do not decide *how* the body of collateral-estoppel doctrine or 28 U. S. C. § 1738 should apply in this case. See n. 2, *supra*.

enforcement. It also shows itself insensitive both to the significant differences between the § 1983 remedy and the exclusionary rule, and to the pressures upon a criminal defendant that make a free choice of forum illusory. I do not doubt that principles of preclusion are to be given such effect as is appropriate in a § 1983 action. In many cases, the denial of res judicata or collateral estoppel effect would serve no purpose and would harm relations between federal and state tribunals. Nonetheless, the Court's analysis in this particular case is unacceptable to me. It works injustice on this § 1983 plaintiff, and it makes more difficult the consistent protection of constitutional rights, a consideration that was at the core of the enacters' intent. Accordingly, I dissent.

In deciding whether a common-law doctrine is to apply to § 1983 when the statute itself is silent, prior cases uniformly have accorded the intent of the legislators great weight.[1] For example, in reference to the judicially created immunity doctrine, the Court has observed that when the "immunity claimed . . . was well established at common law at the time § 1983 was enacted, and where its rationale was compatible with the purposes of the Civil Rights Act, we have construed the statute to incorporate that immunity." *Owen* v. *City of Independence,* 445 U. S. 622, 638 (1980).[2] This very proper inquiry must be made in order to ensure that § 1983 will continue to serve the important goals intended for it by the 42d Congress. In the present case, however, the Court minimizes the significance of the legislative history and discounts its own prior explicit interpretations of the statute. Its discussion is limited to articulating what it terms the single fundamental principle of res judicata and collateral estoppel.

---

[1] See, *e. g., Maine* v. *Thiboutot,* 448 U. S. 1 (1980); *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978); *Imbler* v. *Pachtman,* 424 U. S. 409 (1976).

[2] See also *Robertson* v. *Wegmann,* 436 U. S. 584 (1978) (survival of action); *Carey* v. *Piphus,* 435 U. S. 247 (1978) (nature of damages award).

Respondent's position merits a quite different analysis. Although the legislators of the 42d Congress did not expressly state whether the then existing common-law doctrine of preclusion would survive enactment of § 1983, they plainly anticipated more than the creation of a federal statutory remedy to be administered indifferently by either a state or a federal court.[3] The legislative intent, as expressed by supporters[4] and understood by opponents,[5] was to restructure relations

[3] Senator Osborn's remarks of April 13, 1871, illustrate the contemporary understanding:

"That the State courts in the several States have been unable to enforce the criminal laws of their respective States or to suppress the disorders existing, and in fact that the preservation of life and property in many sections of the country is beyond the power of the State government, is a sufficient reason why Congress should [enact protective legislation]. . . .

"The question now is, what and where is the remedy? I believe the true remedy lies chiefly in the United States district and circuit courts. If the State courts had proven themselves competent to suppress the local disorders, or to maintain law and order, we should not have been called upon to legislate upon this subject at all. But they have not done so. We are driven by existing facts to provide for the several States in the South what they have been unable fully to provide for themselves; *i. e.,* the full and complete administration of justice in the courts. And the courts with reference to which we legislate must be the United States courts." Cong. Globe, 42d Cong., 1st Sess., 653.

[4] See, *e. g., id.,* at 460 (remarks of Rep. Coburn, whom the Court by its reference to the Congressman's "spring up and resume" observation, *ante,* at 100, n. 16, would interpret the other way) ("The United States courts are further above mere local influence than the county courts; their judges can act with more independence, cannot be put under terror, as local judges can; their sympathies are not so nearly identified with those of the vicinage; the jurors are taken from the State, and not the neighborhood; they will be able to rise above prejudices or bad passions or terror more easily. . . . We believe that we can trust our United States courts, and we propose to do so"); Cong. Globe, 42d Cong., 1st Sess., App., at 79 (comments of Rep. Perry) ("The first section provides redress by civil action *in the Federal courts* for a deprivation of any rights, privileges, and immunities secured by the Constitution . . .") (emphasis added).

[5] *Id.,* at 396 (comments of Rep. Rice) ("[The bill] is but a bold and dangerous assertion of both the power and the duty of the Federal Gov-

between the state and federal courts.[6] Congress deliberately opened the federal courts to individual citizens in response to the States' failure to provide justice in their own courts. Contrary to the view presently expressed by the Court, the 42d Congress was not concerned solely with procedural regularity. Even where there was procedural regularity, which the Court today so stresses, Congress believed that substantive justice was unobtainable.[7] The availability of the federal

ernment to intervene in the internal affairs and police regulations of the States and to suspend the exercise of their rightful authority. . . . It is at war with the spirit of a republican Government"); *id.*, at 416 (comments of Rep. Biggs) ("[If this bill should pass] we have by law done what has never before been done in our history, whatever the provocation, namely: authorized the punishment of crimes and offenses of a personal character among us under the Federal tribunals, which shall be of equal authority in criminal cases with our own State courts, and in many cases shall be of superior authority, and of an altogether extraordinary character[.] First, for the violation of the rights, privileges, and immunities of the citizen a civil remedy is to be had by proceedings in the Federal courts, State authorization in the premises to the contrary notwithstanding"); *id.*, App., at 86 (comments of Rep. Storm) ("Now these questions could all be tried, I take it, in the State courts, and by a writ of error, as provided by the twenty-fifth section of the act of 1789, could be brought before the Supreme Court for review. . . . But the first section of this bill does not allow that right. It takes the whole question away at once and forever; and I say that on the ground of delay it is objectionable"). See also *id.*, at 686–687 (comments of Sen. Schurz); *id.*, App., at 216 (comments of Sen. Thurman).

[6] See *id.*, App., at 149 (comments of Rep. Garfield) (stating that Congress, in considering this legislation, must seek equipoise between opposing poles of government, on the one hand, "that despotism which shallows and absorbs all power in a single-central, government," and, on the other, the "extreme doctrine of local sovereignty which makes nationality impossible").

[7] See *id.*, App., at 78 (comments of Rep. Perry) ("Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not; witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices. In the presence of these gangs all the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection. Among the most dan-

forum was not meant to turn on whether, in an individual case, the state procedures were adequate. Assessing the state of affairs as a whole, Congress specifically made a determination that federal oversight of constitutional determinations through the federal courts was necessary to ensure the effective enforcement of constitutional rights.

That the new federal jurisdiction was conceived of as concurrent with state jurisdiction does not alter the significance of Congress' opening the federal courts to these claims. Congress consciously acted in the broadest possible manner.[8] The legislators perceived that justice was not being done in

gerous things an injured party can do is to appeal to justice. Of the uncounted scores and hundreds of atrocious mutilations and murders it is credibly stated that not one has been punished"); *id.*, at 653 (comments of Sen. Osborn) ("The State courts, mainly under the influence of this [Klan] oath, are utterly powerless"); *id.*, at 394 (remarks of Rep. Rainey) ("The question is sometimes asked, Why do not the courts of law afford redress? Why the necessity of appealing to Congress? We answer that the courts are in many instances under the control of those who are wholly inimical to the impartial administration of law and equity. What benefit would result from appeal to tribunals whose officers are secretly in sympathy with the very evil against which we are striving?"); *id.*, App., at 153 (comments of Rep. Garfield) ("But the chief complaint is not that the laws of the State are unequal, but that even where the laws are just and equal on their face, yet, by a systematic maladministration of them, or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them"); *id.*, App., at 166–167 (comments of Rep. Williams regarding Klan methods of securing perjured testimony).

[8] Representative Shellabarger, the bill's sponsor, stated:

"This act is remedial, and in aid of the preservation of human liberty and human rights. All statutes and constitutional provisions authorizing such statutes are liberally and beneficently construed. It would be most strange and, in civilized law, monstrous were this not the rule of interpretation. As has been again and again decided by your own Supreme Court of the United States, and everywhere else where there is wise judicial interpretation, the largest latitude consistent with the words employed is uniformly given in construing such statutes and constitutional provisions as are meant to protect and defend and give remedies for their wrongs to all the people." *Id.*, App., at 68.

the States then dominated by the Klan, and it seems sense-less to suppose that they would have intended the federal courts to give full preclusive effect to prior state adjudications. That supposition would contradict their obvious aim to right the wrongs perpetuated in those same courts.

I appreciate that the legislative history is capable of alternative interpretations. See the Court's opinion, *ante,* at 98–101. I would have thought, however, that our prior decisions made very clear which reading is required. The Court repeatedly has recognized that § 1983 embodies a strong congressional policy in favor of federal courts' acting as the primary and final arbiters of constitutional rights.[9] In *Monroe v. Pape,* 365 U. S. 167 (1961), the Court held that Congress passed the legislation in order to substitute a federal forum for the ineffective, although plainly available, state remedies:

> "It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies." *Id.,* at 180.[10]

The Court appears to me to misconstrue the plain meaning of *Monroe.* It states that in that case "the Court inferred that Congress had intended a federal remedy in three circumstances: where state substantive law was facially unconstitutional, where state procedural law was inadequate to allow

[9] *E. g., Monroe* v. *Pape,* 365 U. S. 167 (1961); *McNeese* v. *Board of Education,* 373 U. S. 668 (1963); *Zwickler* v. *Koota,* 389 U. S. 241 (1967).

[10] To the extent that *Monroe* v. *Pape* held that a municipality was not a "person" within the meaning of § 1983, it was overruled by the Court in *Monell* v. *New York City Dept. of Social Services,* 436 U. S., at 664–689. That ruling, of course, does not affect *Monroe's* authoritative pronouncement of the legislative purposes of § 1983.

full litigation of a constitutional claim, and where state procedural law, though adequate in theory, was inadequate in practice." *Ante,* at 100–101. It is true that the Court in *Monroe* described those three circumstances as the "three main aims" of the legislation. 365 U. S., at 173. Yet in that case, the Court's recounting of the legislative history and its articulation of these three purposes were intended only as illustrative of *why* the 42d Congress chose to establish a federal remedy in federal court, not as a delineation of *when* the remedy would be available. The Court's conclusion was that this remedy was to be available no matter what the circumstances of state law:

> "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court." *Id.,* at 183.

In *Mitchum* v. *Foster,* 407 U. S. 225 (1972), the Court reiterated its understanding of the effect of § 1983 upon state and federal relations:

> "Section 1983 was thus a product of a vast transformation from the concepts of federalism that had prevailed in the late 18th century. . . . The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.' *Ex parte Virginia,* 100 U. S., at 346." *Id.,* at 242.[11]

---

[11] The Court also stated:

"This legislative history makes evident that Congress clearly conceived that it was altering the relationship between the States and the Nation

At the very least, it is inconsistent now to narrow, if not repudiate, the meaning of *Monroe* and *Mitchum* and to alter our prior understanding of the distribution of power between the state and federal courts.

One should note also that in *England* v. *Medical Examiners,* 375 U. S. 411 (1964), the Court had affirmed the federal courts' special role in protecting constitutional rights under § 1983. In that case it held that a plaintiff required by the abstention doctrine to submit his constitutional claim first to a state court could not be precluded entirely from having the federal court, in which he initially had sought relief, pass on his constitutional claim. The Court relied on "the unqualified terms in which Congress, pursuant to constitutional authorization, has conferred specific categories of jurisdiction upon the federal courts," and on its "fundamental objections to any conclusion that a litigant who has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept instead a state court's determination of those claims." *Id.,* at 415. The Court set out its understanding as to when a litigant in a § 1983 case might be precluded by prior litigation, holding that "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then—whether or not he seeks direct review of the state decision in this Court—he has elected to forgo his right to return to the District Court." *Id.,* at 419. I do not understand why the Court today should abandon this approach.

The Court now fashions a new doctrine of preclusion, applicable only to actions brought under § 1983, that is more

with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts." 407 U. S., at 242.

strict and more confining than the federal rules of preclusion applied in other cases. In *Montana* v. *United States,* 440 U. S. 147 (1979), the Court pronounced three major factors to be considered in determining whether collateral estoppel serves as a barrier in the federal court:

"[W]hether the issues presented . . . are in substance the same . . . ; whether controlling facts or legal principles have changed significantly since the state-court judgment; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion." *Id.,* at 155.

But now the Court states that the collateral-estoppel effect of prior state adjudication should turn on only one factor, namely, what it considers the "one general limitation" inherent in the doctrine of preclusion: "that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case." *Ante,* at 95, 101. If that one factor is present, the Court asserts, the litigant properly should be barred from relitigating the issue in federal court.[12] One cannot deny that this factor is an important one. I do not believe, however, that the doctrine of preclusion requires the inquiry to be so narrow,[13] and my understanding of the policies underlying § 1983 would lead me to consider all relevant factors in each case before concluding that preclusion was warranted.

In this case, the police officers seek to prevent a criminal defendant from relitigating the constitutionality of their conduct in searching his house, after the state trial court had

[12] This articulation of the preclusion doctrine of course would bar a § 1983 litigant from relitigating any issue he *might* have raised, as well as any issue he actually litigated in his criminal trial.

[13] See Restatement (Second) of Judgments § 68.1 (Tent. Draft No. 4, Apr. 15, 1977); F. James & G. Hazard, Civil Procedure §§ 11.16–11.22 (2d ed. 1977).

found that conduct in part violative of the defendant's Fourth Amendment rights and in part justified by the circumstances. I doubt that the police officers, now defendants in this § 1983 action, can be considered to have been in privity with the State in its role as prosecutor. Therefore, only "issue preclusion" [14] is at stake.

The following factors persuade me to conclude that this respondent should not be precluded from asserting his claim in federal court. First, at the time § 1983 was passed, a nonparty's ability, as a practical matter, to invoke collateral estoppel was nonexistent. One could not preclude an opponent from relitigating an issue in a new cause of action, though that issue had been determined conclusively in a prior proceeding, unless there was "mutuality." [15] Additionally, the definitions of "cause of action" and "issue" were narrow.[16] As a result, and obviously, no preclusive effect could arise out of a criminal proceeding that would affect subsequent *civil* litigation. Thus, the 42d Congress could not have anticipated or approved that a criminal defendant, tried and con-

---

[14] See *Cromwell* v. *County of Sac*, 94 U. S. 351 (1877); F. James & G. Hazard, Civil Procedure §§ 11.3, 11.16 (2d ed. 1977).

[15] *Triplett* v. *Lowell*, 297 U. S. 638 (1936), overruled by the Court in *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation*, 402 U. S. 313 (1971); *Bigelow* v. *Old Dominion Copper Mining & Smelting Co.*, 225 U. S. 111 (1912); F. James & G. Hazard, Civil Procedure § 11.2 (2d ed. 1977); Restatement of Judgments § 93 (1942); 1B J. Moore, Federal Practice ¶¶ 0.412 [1], 0.441 [3] (2d ed. 1974).

[16] Compare McCaskill, Actions and Causes of Action, 34 Yale L. J. 614, 638 (1925) (defining "cause of action" as "that group of operative facts which, standing alone, would show a single right in the plaintiff and a single delict to that right giving cause for the state, through its courts, to afford relief to the party or parties whose right was invaded"), with C. Clark, Handbook on the Law of Code Pleading 84 (1928) (adopting "modern" rule expanding "cause of action" to include more than one "right"). See also 1 H. Herman, Law of Estoppel and Res Judicata §§ 92, 96 ("cause of action"), 98, 103, 111 ("issue") (1886); Developments in the Law—Res Judicata, 65 Harv. L. Rev. 818, 826, 841–843 (1952).

victed in state court, would be precluded from raising against police officers a constitutional claim arising out of his arrest.

Also, the process of deciding in a state criminal trial whether to exclude or admit evidence is not at all the equivalent of a § 1983 proceeding. The remedy sought in the latter is utterly different. In bringing the civil suit the criminal defendant does not seek to challenge his conviction collaterally. At most, he wins damages. In contrast, the exclusion of evidence may prevent a criminal conviction. A trial court, faced with the decision whether to exclude relevant evidence, confronts institutional pressures that may cause it to give a different shape to the Fourth Amendment right from what would result in civil litigation of a damages claim. Also, the issue whether to exclude evidence is subsidary to the purpose of a criminal trial, which is to determine the guilt or innocence of the defendant, and a trial court, at least subconsciously, must weigh the potential damage to the truth-seeking process caused by excluding relevant evidence. See *Stone* v. *Powell,* 428 U. S. 465, 489–495 (1976). Cf. *Bivens* v. *Six Unknown Federal Narcotics Agents,* 403 U. S. 388, 411–412 (1971) (dissenting opinion).

A state criminal defendant cannot be held to have chosen "voluntarily" to litigate his Fourth Amendment claim in the state court. The risk of conviction puts pressure upon him to raise all possible defenses.[17] He also faces uncertainty about the wisdom of forgoing litigation on *any* issue, for there is the possibility that he will be held to have waived his right to appeal on that issue. The "deliberate bypass" of state procedures, which the imposition of collateral estoppel under these circumstances encourages, surely is not a preferred goal. To hold that a criminal defendant who raises a Fourth Amendment claim at his criminal trial "freely and without reservation submits his federal claims for decision by the state

---

[17] See *Moran* v. *Mitchell,* 354 F. Supp. 86, 88–89 (ED Va. 1973) (noting the defendant's dilemma).

courts," see *England* v. *Medical Examiners*, 375 U. S., at 419, is to deny reality. The criminal defendant is an involuntary litigant in the state tribunal, and against him all the forces of the State are arrayed. To force him to a choice between forgoing either a potential defense or a federal forum for hearing his constitutional civil claim is fundamentally unfair.

I would affirm the judgment of the Court of Appeals.