**In re INDESCO INTERNATIONAL, INC., et al., Debtors.**

**No. 00–15452 (REG).**

United States Bankruptcy Court, S.D. New York.

Oct. 17, 2006.

Andrew K. Glenn and Jeffrey R. Gleit, Kasowitz, Benson, Torres & Friedman, LLP, New York, NY, for Reorganized Debtors.

Joshua J. Angel, Cole, Schotz, Meisel, Forman & Leonard, P.A. and Shlomit

Ophir-Harel, Shiboleth, Yisraeli, Roberts & Zisman L.L.P., for Claimants Merit Abrasive Products, Inc. and Waldock Limited.

## DECISION ON MOTION TO ENFORCE TERMS OF CONFIRMATION ORDER AND CHAPTER 11 PLAN AND CLASSIFY PROOFS OF CLAIM

ROBERT E. GERBER, United States Bankruptcy Judge.

In this contested matter, reorganized chapter 11 debtors, Indesco International, Inc. ("Indesco"), its affiliate AFA Products, Inc. ("AFA"), and Continental Sprayers International, Inc. (the "Debtors"), seek to enforce the classification of the claims of Merit Abrasive Products, Inc. ("Merit") and Waldock Limited ("Waldock," and, together with Merit, the "Claimants") under Class C General Unsecured Clams, making the Claimants eligible to receive stock of the reorganized Debtors under the plan. The Claimants seek reclassification of their claims as Class D Trade Claims, with a resulting cash payment for their claims.

The Claimants contend that Class C classification of their claims would constitute discriminatory treatment in comparison with other Class C claimants, because the Claimants will not receive supplemental rights available to other holders of allowed Class C claims under the plan. The Claimants further contend that their claims are trade claims, which should be classified in Class D of the plan, and not in Class C general unsecured claims, as they are currently classified.

The Debtors seek an order enforcing the confirmed plan and the classification of Claimants' claims under Class C of the plan. First, the Debtors contend that the confirmation order and chapter 11 plan treatment of all of Class C claimholders must be afforded *res judicata* effect. The Debtors further argue that the Claimant's claims are not trade claims and do not qualify as Class D "Trade Claims," but are properly placed with other general unsecured creditors in Class C of the plan.

The Court agrees with the Debtors. The Court grants the Debtors' motion to enforce the terms of, and class treatment under, the confirmed plan, and to classify Claimants' claims in Class C General Unsecured Claims. The following are the Court's findings of fact and conclusions of law in connection with its determinations.

### Facts

On November 17, 2000, several of Indesco's bondholders filed involuntary chapter 11 petitions in this Court against the Debtors. On January 4, 2001, the Debtors consented to the entry of an order for relief, and the case continued as a chapter 11 case with the Debtors remaining in possession. On January 11, 2002, this Court entered the order (the "Confirmation Order") confirming the Modified Fourth Amended Joint Plan of Reorganization (the "Plan"). The Plan became effective on March 15, 2002.

The Plan includes two classes of unsecured claims: (i) Class D, entitled "Trade Claims," consisting of the claims of general unsecured creditors that "arose prior to the Petition Date on account of the furnishing of goods or services to such Debtor by the respective Holders of such Claims"; [1] and (ii) Class C, entitled "General Unsecured Claims," consisting of substantially all other general unsecured claims.[2] Under the Plan, holders of Class D allowed claims receive cash distributions in the allowed amount of such claims.[3]

---

**1.** *See* Plan Art. I, Part B, § 157, Art. III, Part B, § 2.

**2.** *See* Plan Art. I, Part B, § 74, Art. III, Part B, § 2.

**3.** *See* Plan, Art. III, Part B, § 2.

Holders of Class C allowed claims receive their pro rata share of the equity of the reorganized Debtors and may qualify for other supplemental rights.[4]

*The Merit Claim*

On July 13, 2001, Merit filed a proof of claim in the amount of $551,275.00 (the "Merit Claim") for alleged costs and damages incurred by Merit in connection with the termination of an employment agreement with Peter Mancuso ("Mancuso"). On July 25, 1997, AFA entered into an employment agreement with Mancuso. Under the terms of that agreement, Mancuso was to serve as President of AFA for four years. In April 1999, AFA assigned the employment agreement to Merit. In the assignment agreement, Merit allegedly agreed to assume all of AFA's rights and obligations under the employment agreement, and AFA, in turn, agreed to indemnify Merit for any liabilities that Merit would bear if the employment arrangement did not turn out favorably. The alleged indemnification agreement was never memorialized in writing. In January 2001, Merit terminated Mancuso's employment six months prior to the expiration of the employment term. In May 2001, Merit and Mancuso entered into a settlement agreement pursuant to which Merit continued to compensate Mancuso through the term of the employment agreement. In July 2001, Merit filed the Merit Claim based on its alleged indemnification agreement with AFA for payments made by Merit to Mancuso as a result of Mancuso's termination.

*The Waldock Claim*

On February 11, 2002, Waldock filed a proof of claim in the amount of $116,919.00 (the "Waldock Claim") for allegedly unpaid obligations owing under a promissory note issued by AFA to Waldock in or about 1997.

The Merit and Waldock Claims were both disputed at the time of Plan confirmation.[5] The Debtors have now agreed to allow the Merit Claim for $303,201.25 and the Waldock Claim for $64,305.45.

*Discussion*

I. *Res Judicata as Applied to Treatment of Class C Claims Under the Plan.*

The Claimants assert that there is unfair treatment of disputed general unsecured claims under Class C of the Plan. They assert that since their claims were not allowed until after the time to exercise Supplemental Rights has expired, they are ineligible to receive this additional distribution available to qualifying Class C claimholders. They argue that "[t]he ability to exercise Supplemental Rights is so obviously gerrymandered, and exclusory

---

4. *Id.* Article III of the Plan provides that each holder of an allowed Class C claim will receive when allowed

> (a) its Pro Rata share of one-hundred (100%) of the New Indesco Common Stock issued and outstanding as of the Effective Date, subject to Dilution, and (b) the other distributions provided for in this Section III.B.2 ...
>
> In addition to its distributions described above, each Holder of an Allowed Non–Note General Unsecured Claim shall receive, on the later of (i) the Effective Date or (ii) the date on which such Claim becomes an Allowed Claim ... a number of Supplemental Rights that shall be propor-

tional to the Original Rights issued to the Holders of Subordinated Note Claims ... *provided* ... that ... such Holder shall have delivered, or caused to be delivered, to the Claims Agent prior to the Ballot Deadline a ... Ballot evidencing ... such Holder's (i) acceptance of the Chapter 11 Plan and (ii) irrevocable commitment to (x) exercise all or portion of the Supplemental Rights that may be issued to such Holder under the Chapter 11 Plan and (y) pay the Exercise Price for such Supplemental Rights ...

5. *See* this Court's Decision on Reorganized Debtor's Objections to Claim of Merit Abrasive Products, Inc. and Waldock Limited, dated March 25, 2005.

[sic] that it must be deemed to be illusory if the holders of disputed claims are to now be shoehorned into this class."[6] But the Claimants' assertions of unfair discrimination are untimely and should have been raised prior to or as an objection at the confirmation hearing.

■ Under principles of *res judicata*, a prior final judgment on the merits of a claim between the same parties precludes those parties from relitigating issues that were or could have been raised in the action in which the claim was adjudicated.[7] Under familiar principles, and decisions of this Court, among many others, *res judicata*, or claim preclusion, prohibits litigation of any claim that was available to a party in a prior proceeding, whether or not the judgment actually determined that ground or claim.[8] The doctrine of *res judicata* serves a multitude of important interests, including but not limited to "reliev[ing] parties of the cost and vexation of multiple lawsuits, conserv[ing] judicial resources, and, by preventing inconsistent decisions, encourag[ing] reliance on adjudication."[9]

■ The doctrine of *res judicata* precludes the parties from relitigating claims if the earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same claim.[10] It is generally held that "a judgment is *res judicata* not only as to all matters litigated and decided by it, but as to all relevant issues which could have been but were not raised and litigated in the suit."[11]

■ The doctrine of *res judicata* applies "with equal force to final judgments rendered by the bankruptcy courts."[12] A bankruptcy court's order of confirmation is treated as a final judgment with *res judicata* effect.[13] Pursuant to 11 U.S.C. § 1141(a), a confirmed plan of reorganization is binding on all parties.[14] Therefore, after confirmation, all parties are precluded from raising claims that they could have raised but failed to raise before confirmation.[15] Thus, questions concerning reorganization plan structure that assertedly unlawfully prejudices particular creditors, or classes of claims, may no longer be raised

---

**6.** *See* Memorandum of Law of Claimants Merit and Waldock at p. 6.

**7.** *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), *see also First Union Commer. Corp. v. Nelson,* 81 F.3d 1310, 1314–1315 (4th Cir.1996); *In re Penn–Dixie Indust., Inc.,* 32 B.R. 173, 176 (Bankr. S.D.N.Y.1983).

**8.** *In re Dabrowski,* 257 B.R. 394, 404 (Bankr. S.D.N.Y.2001).

**9.** *Allen,* 449 U.S. at 94, 101 S.Ct. 411.

**10.** *In re Teltronics Servs., Inc.,* 762 F.2d 185, 190 (2d Cir.1985); *Sure–Snap Corp. v. State St. Bank and Trust Co.,* 948 F.2d 869, 872, 874 (2d. Cir.1991).

**11.** *Penn–Dixie,* 32 B.R. at 177, citing *Heiser v. Woodruff,* 327 U.S. 726, 735, 66 S.Ct. 853, 90 L.Ed. 970 (1946); *Sure–Snap,* 948 F.2d at 873 (citation omitted).

**12.** *Dabrowski,* 257 B.R. at 405, citing *Air Line Pilots Intl. v. Continental Airlines, Inc.,* 145 B.R. 404, 409 (D.Del.1992).

**13.** *First Union,* 81 F.3d at 1315; *see also In re Appel Corp.,* 300 B.R. 564, 567 (S.D.N.Y. 2003).

**14.** 11 U.S.C. § 1141(a) states in relevant part:

Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor . . . whether or not the claim or interest of such creditor . . . is impaired under the plan and whether or not such creditor . . . has accepted the plan. *See also First Union,* 81 F.3d at 1315.

**15.** *First Union,* 81 F.3d at 1315.

after plan confirmation.[16] Courts apply *res judicata* principles to bar parties from asserting a legal position after failing, without reason, to object to the relevant proposed plan of reorganization, to object to the confirmation of the plan or to appeal the confirmation order.[17]

The Claimants are barred from objecting to the fairness of treatment of Class C disputed claims by *res judicata*. First, the confirmation order constitutes a final judgment on the merits with *res judicata* effect. The confirmation order entered in this case was not appealed by any party, and remains valid and fully enforceable. Second, the jurisdiction of this Court over the confirmation of the plan is undisputed. All parties to the proceedings had adequate notice of the confirmation hearing and no party has brought to the Court's attention any issues with the way the confirmation hearing was conducted. Most importantly, the Claimants' objections to the treatment assigned to classes under the plan of reorganization could have and should have been raised at the confirmation hearing.

Now, post confirmation, the Claimants assert that the treatment of disputed claimholders in Class C is discriminatory and that they are being shoehorned into Class C without receiving all the benefits awarded to claimholders in that class. The Claimants failed to bring their concerns with the fairness of treatment of Class C claimholders under the Plan to the attention of the Court at or before the confirmation hearing, and waited until after the confirmation of the Plan to challenge the treatment of Class C claims as unfair discrimination and gerrymandering. The Claimants presented no evidence, and this Court is not aware of any evidence, suggesting that the Claimants could not have raised this issue at or prior to the confirmation hearing. While the Claimants' claims were not allowed until after Plan confirmation, the Claimants could nevertheless have objected to the treatment of Class C claimholders, because it was fully foreseeable, and at least reasonable, to believe that their claims, if and when allowed, would be included in that class.

The Claimants' assertion, at this late stage post-confirmation, that Class C treatment of disputed claims generally and of their claims specifically is discriminatory is barred by the principles of *res judicata*.

## II. Satisfying the Definition of "Trade Claims" as Defined in the Plan.

The Claimants argue that their claims should be placed in Class D Trade Claims, because both Merit and Waldock performed services for the Debtors. Under the plan, the claims included in Class D Trade Claims consist of the claims of general unsecured creditors that "arose prior to the Petition Date on account of the furnishing of goods or services to such Debtor by the respective Holders of such Claims."[18] The Claimants urge that the "goods and services" modifier in the Plan definition of Trade Claims be broadly interpreted to mean a conferred benefit.

---

**16.** *See Sure–Snap,* 948 F.2d at 873 (noting that confirmation plan binds its debtors and creditors as to all the plan's provisions and all related claims which could have been litigated in the same cause of action.)

**17.** *First Union,* 81 F.3d at 1315; *Penn–Dixie,* 32 B.R. at 177 (denying creditors' motion to revise post-confirmation the payment scheme outlined in the plan, where the issue "could have been raised by motion at any time during the reorganization case. Moreover, no appeal was taken from any of the final orders of this Court nor was an objection to confirmation ever made.")

**18.** *See* Plan Art. I, Part B, § 157, Art. III, Part B, § 2.

However, under such reading of the Plan, every claim would be treated as a "trade claim." The Court rejects the Claimants' broad reading, and agrees with the Debtors' assessment that the Claimants' claims are not "Trade Claims" contemplated by the definition of Class D. The Court finds that the Claimants claims are properly classified under Class C General Unsecured Claims.

First, Merit and Waldock attempt to support their position that they rendered a "service" to the Debtors by noting that they checked the "services performed" section when filing their proofs of claim. This argument is wholly unconvincing. The Claimants' self-serving assertion that they rendered a service to AFA has no bearing on whether an actual service was indeed provided.[19]

Merit further asserts that it provided an "accommodation service" to AFA when it agreed to employ Mancuso, whose position became redundant after AFA merged with Continental. Thus, Merit alleges that had it not hired Mancuso, AFA would have been responsible for paying Mancuso a sizeable severance allowance for terminating him without cause. In exchange for its "services" rendered, Merit contends that AFA agreed to indemnify Merit in the event that Mancuso's employment ended prematurely and caused financial loss to Merit. It thus argues that this alleged agreement to indemnify Merit against financial loss in connection with that "accommodation service" gave rise to the Merit Claim.[20]

The Court cannot agree. Merit did not perform a service contemplated under Class C of the Plan. The Merit Claim relates to an alleged promise of indemnification to Merit, and is not the result of any goods or services provided by Merit. Indemnification with respect to an employment agreement is a payment of a bargained for financial right to the indemnified party.[21] Indemnification is not a payment for a rendered service, as the Claimants allege. Accordingly, the Debtors correctly placed Merit's Claims in Class C of the Plan along with other general unsecured claims.

Waldock similarly argues that it performed a service for AFA by agreeing to release it from a $2 million indebtedness when Indesco's parent company, Indesco Holdings, Inc., assumed Waldock's loan to AFA, in connection with Indesco's floating of a public high yield bond issue. According to Waldock, the underwriters allegedly insisted that no debt be senior to the bonds and Waldock's debt was structurally senior to the contemplated bonds; that as an "accommodation service" to AFA and underwriters, Waldock allegedly agreed to Indesco's parent's assumption of the loan; and that as a quid pro quo, Waldock agreed with the underwriter that the interest on the loan that accrued on the debt since inception, in the amount of $116,919,

---

19. Waldock Claimant states that "[i]t is Waldock's further position that referring to its claim in the alternative as being either 'loan' or 'service' based is irrelevant to the issues of Plan classification in the Bankruptcy Case." *See* Memorandum of Law of Claimants Merit and Waldock at p. 2. The Court agrees that the substance of a claim, not its title, governs its classification. Here, the substance of neither the Merit nor the Waldock Claim constitutes a service.

20. *See* Memorandum of Law of Claimants Merit and Waldock at p. 9.

21. According to Black's Law Dictionary (8th ed.2004), "indemnity" is "1. A duty to make good any loss, damage, or liability incurred by another. 2. The right of an injured party to claim reimbursement for its loss, damage, or liability from a person who has such a duty."

would remain as AFA's debt to Waldock and be senior to the bonds.

That may support allowance of the Claim, but it does not make the Claim one for furnishing goods or services to the Debtors. The Waldock Claim arose from a loan to AFA, which was embodied in a subordinated note. The amount owed to Waldock was not a fee for the "accommodation service" performed by Waldock, but a payment of interest on an antecedent debt, and even if it were an "accommodation service", it was not for the kinds of "goods and services"—plainly trade claims—envisioned under the Plan. The Debtors correctly placed Waldock's Claims in Class C of the Plan.[22]

### Conclusion

For the foregoing reasons, the Court grants the Debtors' motion to enforce the confirmation order and the Plan, and holds that the Claimants' claims are properly placed in Class C with other general unsecured claims. Claimants will be eligible for their pro rata share of stock distribution under the Plan, but not the cash that would go to providers of goods and services.

---

22. Even Claimants themselves realize the questionable nature of their assertion and acknowledge that "[a]t first, alternately attributing the genesis of the Waldock Claim to a 'loan', and to 'services performed' appears to be inconsistent." *See* Memorandum of Law of Claimants Merit and Waldock, at p. 2.