**David CHAMBERS, Prisoner, Branch Prison at Marquette, Plaintiff,**

v.

**Theodore KOEHLER, individually and in his official capacity as the Warden of the Branch Prison at Marquette, and Jerry Sherman, individually and in his official capacity as the hearing officer of the Branch Prison at Marquette, and David Kirkwood, individually and in his official capacity as the Resident Unit Officer of the Branch Prison at Marquette, Defendants.**

**No. M84–139 CA2.**

United States District Court, W.D. Michigan, N.D.

Dec. 31, 1984.

---

David Chambers, in pro. per.

Frank J. Kelly, Atty. Gen., Lansing, Mich., for defendants.

## OPINION

MILES, Chief Judge.

This is a civil rights action filed pursuant to 42 U.S.C. § 1983 by an inmate at the Marquette Branch Prison against the Warden (Koehler), a Hearings Officer (Sherman), and a Corrections Officer (Kirkwood) at the prison.[1]

Plaintiff's claim arises out of a serious and wide-spread riot which occurred at the Marquette Branch Prison and other Michigan prisons during the 1981 Memorial Day weekend. The riots resulted in the burning of buildings, property losses in the millions, and assaults upon guards and inmates by other inmates. Plaintiff was charged with rioting and found guilty by a hearings officer (defendant Sherman) in a prison disciplinary hearing. He now alleges a violation of his constitutional rights with respect to the hearing, and seeks declaratory and injunctive relief, as well as compensatory and punitive damages.

The defendants have filed a motion to dismiss for failure to state a claim upon which relief can be granted, or, in the alternative, for summary judgment. Fed.R. Civ.P. 12(b)(6), 56(b). The motion is supported by copies of the official records pertaining to plaintiff's disciplinary hearing, including appellate records in the local state circuit court with respect thereto. Although plaintiff has filed a "Traverse" to the defendants' motions to dismiss or for summary judgment, his "Traverse" is directed to the arguments raised in defendants' supporting brief, rather than to the authenticity of the prison records. The undisputed material facts as disclosed by the present file are as follows:

The riot referred to above occurred at the Marquette Branch Prison on May 26, 1981. On May 31, 1981, a misconduct ticket signed by officer Kirkwood was issued against the plaintiff, charging him with rioting. On June 4, 1981, plaintiff was given a formal hearing before a hearing officer. He was adjudged guilty and given seven days detention. Thereafter, he sought judicial review of the hearing officer's decision in the Circuit Court of Marquette County, as provided in M.C.L.A. § 791.255, M.S.A. § 28.2320(55). Circuit Judge McDonald on September 11, 1981, issued an opinion in which he held that the decision of the hearing officer was conclusory and remanded the case to the hearing officer for further findings.

Pursuant to the remand order, a rehearing was held before Hearing Officer Sherman on October 5, 1981, following which plaintiff was again adjudged guilty. Plaintiff again filed a petition for judicial review in the Circuit Court of Marquette County

---

1. This action was initially filed in the Circuit Court of Ingham County, but was thereafter removed by the defendants to this court pursuant to 28 U.S.C. §§ 1441(a) and 1446.

pursuant to the applicable statute. Circuit Judge McDonald, after reviewing the record, entered the following order of dismissal on November 6, 1981.

This matter having come before the Court on Plaintiff's Petition for Judicial Review pursuant to MCLA 24.301 *et seq;* a certified copy of the administrative record having been filed and reviewed by the Court including the findings on remand, and the Court being fully advised in the premises;

NOW, THEREFORE, IT IS HEREBY ORDERED that the within Petition be and is hereby DISMISSED with prejudice, the Court having determined that the substantial rights of the Plaintiff have not been prejudiced, and no grounds for reversal of the agency decision are present.

Plaintiff now alleges a violation of his constitutional rights essentially on three grounds. His primary claim is that he was deprived of due process and equal protection because the evidence before Hearing Officer Sherman was not sufficient to support his conviction, and because the Hearing Officer's decision "conflicts with the facts of the case." (Complaint, pars. 31 and 33). Hearing Officer Sherman stated the reasons for his findings in his Misconduct Hearing Report as follows:

This is a rehearing of the rioting charge against resident Chambers based on the incidents of 5–26–81, as ordered by Judge McDonald in his decision of 9–11–81. Resident Chambers is charged with the major misconduct of Incite to Riot or Strike, Rioting or Striking, code 022, which is defined in PD–DWA 60.01 as "Encouragement of action to disrupt or endanger this institution, persons or property; participation in such action. Officer Kirkwood states in the misconduct report that during the riot of 5–26–81 resident Chambers entered the block with the yard whistle, but that he chose to return to the riotous yard shortly thereafter where he was observed yelling loudly and agitated.

Lt. Forstrom states in his report of 6–1–81, which was part of the informational packet given the hearing officers, that at 9:45 G block was secured by an armed squad of officers, that at this time all residents were locked up, that at 10:20 a group of unarmed civilian employees were sent into the block to remove all debris that could be used as a weapon and that at 10:35 he gave an order to the residents on the yard who locked in G block to return to the block or be considered rioters. The Lt. states that the above order was given by himself over the bullhorn and repeated several times over the yard P.A. and that no inmates went in at this time.

Resident Chambers states that he did remain on the yard and that he did not go into the block because it was not secured and because he had heard that two black guys were going to get him. Resident's statement is supported by the inmate witnesses that he now presents. It is noted that no one can identify the black residents who made the alleged statement and that as resident Chambers stated in the original hearing he never recieved (sic) any direct threats (sic). From the above it is found that resident did remain on the yard as alleged by officer Kirkwood, that he was yelling and did appear agitated, that he was given an order and opportunity to enter the block as stated by Lt. Forstrom and that he did not obey it and chose to remain on the yard, as admitted by the resident. Further, it is found that at the time resident was given an order and opportunity to go to his block it had been secured by an armed squad, that it had been cleared by unarmed staff, that all residents had been locked up and that the order to go to the block was audable (sic) and was heard by the resident. Resident's claim that he did not go to the block earlier is not supported by specific evidence stating who made the threats (sic) or what exactly they were—the fact that the resident now presents 3 witnesses does not increase the credibility of the statement.

It is found that resident's action of remaining outside of the block after being given an order and opportunity to go to the block when it was secure and his disorderly action in the early part of the riot as observed by officer Kirkwood show an intent to hinder and disrupt officers trying to clear the yard and secure the blocks so that fire fighting equipment and personel (sic) could be brought in, an intent to lend support and encouragement to others refusing to go in by his own disobedience and an intent to be an active participant in the riot. Resident is found guilty of the charge as his intentional actions of not going to the secured block when he had the opportunity and when ordered to do so and of remaining on the yard in an agitated state and yelling were both an encouragement and a participation in a riot endangering persons and property.

■ The Hearing Officer arrived at his decision after considering the evidence as given by officer Kirkwood, Lt. Forstrom, the plaintiff, and the plaintiff's witness. It is apparent that he was called upon to resolve conflicts in the evidence and to resolve questions of credibility. Conflicts in evidence are not unusual in prison disciplinary hearings, nor, for that matter, in cases tried in this court. It is the function of the hearing officer (or the trial judge or jury in cases in this court), as the factfinder, to resolve such conflicts, and to determine issues of credibility. Federal district courts do not sit as appellate courts to review the fact findings of prison hearing officers. To the extent that there was a dispute as to the factual circumstances, it was the function of the hearing officer, not this court, to resolve it. In *Willis v. Ciccone*, 506 F.2d 1011, 1018 (8th Cir.1974), the court stated:

As we have noted previously, the role of the district court is not to afford a de novo review of the disciplinary board's factual findings. The district court should simply determine whether the decision was supported by some facts. The sole and only issue of constitutional substance is whether there exists any evidence at all, that is, whether there is any basis in fact to support the action taken by the prison officials. (Citations omitted). Otherwise the federal court would assume the task of retrying all prison disciplinary disputes.

Similarly, in *McCrae v. Hankins*, 720 F.2d 863, 868 (5th Cir.1983), the court held:

The constitution demands due process, not error-free decision-making, and the disciplinary board's decision in this case was supported by "some facts" before the board. *See Smith v. Rabalais*, 659 F.2d 539, 545 (5th Cir.1981).

■ Plaintiff here is seeking to convert this federal court into an appellate court to review the fact findings of Hearing Officer Sherman. This he cannot do. Plaintiff sought such review by the Circuit Court of Marquette County. When he received an adverse decision, he was free to appeal to the Michigan Court of Appeals. He chose not to do so, and the decision of the circuit Court thus became final. It is true that exhaustion of state remedies is not a prerequisite to the filing of a section 1983 action in a federal court. It does not follow, however, that the federal court can be used to review fact findings of prison disciplinary proceedings, as clearly set forth in *Willis v. Ciccone* and *McCrae v. Hankins, supra.* Since there were facts before the hearing officer to support his decision, no constitutional violation has occurred.

■ Petitioner is also precluded from asserting his primary claim in this court under the doctrine of res judicata or collateral estoppel. Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were *or could have been raised* in that action. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation on a different cause of action involving a party to the first case. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980). These prin-

ciples of claim preclusion are generally applicable to section 1983 actions. *Allen v. McCurry, supra; Loudermill v. Cleveland Board of Education,* 721 F.2d 550, 557 (6th Cir.1983). Plaintiff here filed an action for judicial review of his first disciplinary hearing in the Marquette Circuit Court. He claimed that the hearing officer's decision was conclusory and unsupported by proper findings. The circuit judge agreed and remanded the case for rehearing. The rehearing was held and plaintiff was found guilty at the rehearing. He again sought judicial review in the local circuit court. The circuit judge, after reviewing the record and the findings on remand affirmed the hearing officer's decision "having determined that the substantial rights of the Plaintiff have not been prejudiced, and no grounds for reversal of the agency decision are present." Thus, the primary due process claim which plaintiff now asserts in the present action was of necessity an issue in the state court and decided against him in that court. He is therefore precluded from relitigating that claim here. Plaintiff argues in his "Traverse" that the doctrine of res judicata does not apply because the federal constitutional issue of due process and equal protection was not raised in the state court. The short answer to that argument is that (1) the issue was necessarily involved in the state court's determination that "the substantial rights of the Plaintiff have not been prejudiced," and (2) the doctrine of res judicata precludes litigation of issues that were *or could have been raised* in the prior action.

Finally, insofar as any pecuniary liability of Hearing Officer Sherman is concerned, it is apparent that his actions were taken by him in the course of his official judicial and quasi-judicial duties. As such, he is entitled to the judicial immunity accorded to inferior judicial and quasi-judicial officers. *Butz v. Economou,* 438 U.S. 478, 514, 98 S.Ct. 2894, 2914–15, 57 L.Ed.2d 895 (1978); *Kurzawa v. Mueller,* 732 F.2d 1456 (6th Cir.1984); *Ward v. Johnson,* 690 F.2d

1098, 1105 (4th Cir.1982); *Littlejohn v. Fisher,* 530 F.2d 691 (6th Cir.1976).

Plaintiff's second claim is that he was deprived of due process because he was not afforded a hearing investigator to investigate his case prior to the hearing. This claim is based on the doubtful assumption that the furnishing of a hearing investigator is a constitutional requirement. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), which sets forth the due process requirements for prison disciplinary hearings, imposes no such requirement. However, even if it is assumed that plaintiff had a right to a hearing investigator, the Misconduct Report, which charged him with the offense, contains an "x" in the "no" box, following the question "Hearing investigator requested?" Plaintiffs acknowledged receiving a copy of the Misconduct Report by his signature at the bottom of the form. Plaintiff now claims that the "no" box was "inadvertently checked." (Complaint, par. 19). Assuming this is true, plaintiff had ample opportunity to bring this to the attention of the hearing officer, if not before his first hearing, certainly before the subsequent rehearing. In any event, plaintiff is precluded from now raising this claim in the present action under the principles of claim preclusion discussed above with respect to his primary claim.

Plaintiff's third and final claim is that he was deprived of due process and equal protection, as well as his right under the Eighth Amendment to be free of cruel and unusual punishment because defendants Koehler and Kirkwood "failed to insure safety for the Plaintiff during the riot of May 26, 1981." (Complaint, par. 32). One has only to read the description of the Memorial Day riots as contained in plaintiff's complaint, in the report of Lt. Bruce Forstrom,[2] in the hearing officer's findings, and in the opinion of the Honorable Stewart A. Newblatt in *Walker v. Johnson,* 544 F.Supp. 345 (E.D.Mich.1982), which was a class action suit involving all the Michigan

---

**2.** Lt. Forstrom's report appears as an exhibit to    defendants' motions and supporting brief.

prisons in which riots occurred that weekend, to conclude that plaintiff's claim, that the defendants could have insured his safety during the riot, borders on the frivolous. As stated in the beginning of this opinion, the riot in question was not a minor disturbance. The court takes judicial notice of the fact that the riots which occurred that weekend, and which were widely reported in the press, occurred not only at the Marquette Branch Prison, but also at the Michigan Reformatory and the State Prison of Southern Michigan. They were major and serious conflagrations in which prisoners went on a rampage. Buildings were set afire by inmates; inmates and guards were assaulted by other inmates; looting was rampart; property loss was in the millions; and general havoc prevailed until the institutions could be finally locked down. To claim, as plaintiff now does, that the defendant Warden and officer Kirkwood are liable because they failed to insure his safety during the riot, is to ignore the realities of prison life. Courts have had occasion to comment on inmate violence in the more limited context of individual inmate assaults. Just recently, the United States Supreme Court in *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), noted:

> Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others. Even a partial survey of the statistics on violent crime in our Nations's prisons illustrates the magnitude of the problem. During 1981 and the first half of 1982, there were over 120 prisoners murdered by fellow inmates in state and federal prisons. A number of prison personnel were murdered by prisoners during this period. Over 29 riots or similar disturbances were reported in these facilities for the same time frame. And there were over 125 suicides in these institutions. See Prison Violence 7 Corrections Compendium (Mar.1983). Additionally, informal statistics from the U.S. Bureau of Prisons show that in the federal system during 1983, there were 11 inmate homicides, 359 inmate assaults on other inmates, 227 inmate assaults on prison staff, and 10 suicides. There were in the same system in 1981 and 1982 over 750 inmate assaults on other inmates and over 570 inmate assaults on prison personnel.

104 S.Ct. at 3200.

In *Campbell v. Anderson*, 335 F.Supp. 483 (D.Del.1971), the court observed:

> Indeed, it is doubtful that inmate against inmate violence can ever be prevented within a prison setting no matter how carefully a prison might be operated. Courts must comprehend the magnitude of the prison administrators' problem and recognize the distinctly unique situation caused by confining human beings in a tension-filled atmosphere. Inmate assaults upon inmates are not unusual in the best run prisons. For example, during 1961 in the federal prisons alone, more than a thousand assaults by inmate upon inmate occurred.

335 F.Supp. at 486.

Similarly, in *Penn v. Oliver*, 351 F.Supp. 1292 (E.D.Va.1972), the court stated:

> In determining whether a given act or omission by prison authorities rises to the level of deprivation of the right to security, the Court takes notice of the violent nature of the men who inhabit the Virginia prisons. It would be fantasy to believe that even the most enlightened prison officials operating with unlimited resources could prevent all acts of violence within the prison.

351 F.Supp. at 1294.

The allegations of plaintiff's complaint do not, of course, refer to an isolated assault by one inmate against another, but rather to a general riot involving numerous

assaults by inmates against other inmates as well as against prison guards. This serves to magnify the problems facing prison administrators when a riot of the type involved here occurs. Indeed, plaintiff does not allege that he was physically injured during the riot. Rather, he alleges that he feared for his mental and physical safety. The court does not doubt this. The court concludes, however, that in view of the conditions then existing and the defendants' response to those conditions, as described in the complaint and in the other documents in the present record, such as the report of Lt. Forstrom, the defendants cannot be charged with a violation of plaintiff's constitutional rights. In *Labatt v. Twomey*, 513 F.2d 641 (7th Cir.1975), the court warned against second-guessing the actions of prison officials in anticipating and dealing with prison emergency conditions:

> Prison officials reacting in good faith to perceived emergency situations must not be unduly hindered by overbroad federal judicial scrutiny, on the basis of hindsight, of the factual basis underlying their actions. "We recognize that present or impending disturbances which might overtax the control capacity of a prison creates a dominant interest in prison authorities being able to act without delay if they feel that delay would endanger the inmate, others, or the prison community. [Citation omitted.] This is so even though the assessment of difficulties may subsequently prove to be unfounded..." *Gomes v. Travisono, supra,* 490 F.2d [1209] at 1215. The psychology and social stability of a prison community are foreign to one who is not involved with it on a day-to-day basis. Any attempt to reconstruct, at a later date, the conditions present at the time of dispute, and the dangers then feared by prison authorities, is fraught with perils of misunderstanding and misapprehension.
>
> Accordingly, the standard of review of a challenge to the sufficiency of the basis for emergency response must be generous to the administration. We conclude that, absent a claim of bad faith or mere

pretext on the part of prison authorities in the imposition of emergency procedures, the underlying basis of decision must be deemed to lie fully within their expertise and discretion and, accordingly, is insulated from subsequent judicial review.

513 F.2d at 647.

For the reasons stated herein, defendants' motion for summary judgment is granted, and the complaint is dismissed.