Bobby Jean CAUSEY

v.

K & B INC.

Civ. A. No. 86–4753.

United States District Court,
E.D. Louisiana.

Sept. 8, 1987.

Robert E. Tarcza, Feingerts & Kelly, New Orleans, La., for plaintiff.

Richard E. McCormack, James B. Irwin, Montgomery, Barnett, Brown, Read, Hammon & Mintz, New Orleans, La., for defendant.

## AMENDING AND SUPERSEDING OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter came before the Court for nonjury trial on June 25, 1987. Having considered the evidence, the memoranda of the parties and the applicable law, the Court rules as follows. To the extent any of the following Findings of Fact constitute Conclusions of Law, they shall be adopted as such. To the extent any of the following Conclusions of Law constitute Findings of Fact, they shall be so adopted.

### Findings of Fact

Plaintiff brought this suit claiming she was discriminatorily discharged by defendant K & B Inc. on account of her race, in violation of Section 703(a) of Title 7, 42 U.S.C. § 2000e–2(a) and 42 U.S.C. § 1981, and that K & B committed certain intentional torts against the plaintiff through the infliction of emotional distress and defamation. Defendant alleges plaintiff was discharged for violation of company policy for her complicity in a co-employee's theft of a "Paramount" yard blower from a K & B warehouse and for failing to report the theft. Certain background facts are stipulated by the parties, and the Court heard extensive testimony as to events immediately prior to plaintiff's discharge.

The parties stipulated plaintiff was hired by K & B in November 1970, had an exemplary work performance record and never had a disciplinary problem. She was terminated on January 6, 1986, three months after having been named employee of the month. On the date of her termination, plaintiff was an Order Filler at K & B's Labarre Avenue Warehouse located in Jefferson, Louisiana.

Plaintiff's termination resulted from events set in motion at a Christmas party held for warehouse employees on Tuesday, December 24, 1985, at the Labarre Warehouse. Plaintiff and defendant stipulated K & B provided at the party various prizes, awards, gifts, food and alcoholic beverages. It is further stipulated plaintiff was among the last dozen or so employees to leave the party area and with company consent, had obtained a hand cart on which were loaded various items of food and drink left over from the party. Several other employees had similar carts. The parties have further stipulated that at all material times during December 24, 1985, security guard Daryl Charles was on duty and stationed at a gate constituting the only exit from a continuous fence surrounding the warehouse and accompanying grounds. Among the employees leaving the party area at about the same time as the plaintiff were Norvin Ricard, a black male who was plaintiff's supervisor at the K & B warehouse; John Jackson, also black; and Pauline Laplaca, Marlon Bordelon, Mike Kahrs, Joe Colna and Pearl Soniat, all white warehouse employees. Ricard was accused by Bordelon and Laplaca of stealing the yard blower from the warehouse as he departed the party with plaintiff, who allegedly witnessed the theft.

The testimony of the witnesses focused upon events surrounding the alleged theft and K & B's subsequent investigation into the theft. Detailed testimony traced each witness's departure from the Christmas party through the warehouse and into the parking lot. Counsel for both parties made numerous attempts to point out inconsistencies in the testimony of the witnesses, with each side urging their preferred version of the facts. However, the Court finds many of the asserted inconsistencies related to relatively minor details and appeared to the Court to have resulted from a particular witness' failure to observe certain events, rather than the observation and report of directly contradictory facts.[1]

---

1. For example, although some witnesses testified "they did not see anything" suspicious that

The Court is also left with the overall impression that some disorder in the testimony was due to the amount of alcohol consumed at the Christmas party. The Court will review material aspects of the testimony below before stating its findings.

First, the Court heard Ricard's testimony. He is not currently employed and was terminated from K & B after twenty-two years as a result of the accusations of Bordelon and Laplaca. At the time of his termination, he was Supervisor of the warehouse Tobacco Department. Ricard testified he departed the warehouse party at approximately 12:00 to 12:30 p.m. and denied the theft of the blower.

Concerning possible racial animus, Ricard testified he was accused by Bordelon of stealing the blower because Bordelon "doesn't like black people." He traced Bordelon's attitude to a point in time eight years ago when Ricard was asked to supervise Bordelon's activity and Bordelon said, "Ain't no nigger gonna tell me what to do." Ricard also testified that his supervisor had to break up arguments about ethnic jokes and that "the next thing," Bordelon had been transferred to work in another department. He also testified that Laplaca was motivated to accuse him of stealing the blower because of an incident in 1985 involving a co-employee who threw ice water in his face, and a resulting "story" that Ricard had hit the employee.

Ricard also testified to the occurrence of certain discriminatory incidents during the investigation of the alleged theft. In particular, he testified that Lonnie Henry, K & B's Assistant Director of Security and Safety, asked Ricard why he "didn't just go ahead and pay for the blower" stating, "You know how you people are." He also testified to being pressured by security guards, who stated during an interview they knew Ricard took the blower and they wanted him to sign a paper admitting to the theft.

The Court next heard testimony of Pauline Laplaca who at the time of the incident was an Order Filler at the warehouse. Although admitting she had three drinks at the party, she recalled seeing the plaintiff together with Ricard departing the party, and on making a turn to leave the warehouse, passing a pallet of power blowers, at which time Ricard picked up a blower and put it under his arm. She did not believe the plaintiff and Ricard saw her and there was no one else around at that time. Laplaca also stated the power blower was located in a big green container and was then placed in a "clear brown plastic bag" on the cart, but no one was checking packages as the employees departed the warehouse. The witness asked Mike Kahrs, who was nearby, whether he had seen the power blower Ricard picked up. She further testified that at one point, the blower fell off the cart at a time when both Kahrs and Laplaca were passing the cart.

Laplaca denied having any knowledge of the 1985 incident concerning the ice water and denied having anything against either plaintiff or Ricard. Laplaca stated she did not report the theft to anyone other than Kahrs, but she reminded Kahrs of the incident when she returned to work. Ultimately Laplaca was interviewed by James Betbeze, K & B's Director of Safety and Security, at K & B Plaza regarding her allegations and took a polygraph test.

Pearl Soniat next testified she left the party around 2:00 also with a cart. She testified to seeing the plaintiff and Ricard departing the party ahead of co-employee John Jackson, but did not see anything unusual. She was not interviewed by anyone in connection with the alleged theft.

The Court also heard the testimony of Marlon Bordelon, a K & B Shipping Supervisor. Bordelon testified to leaving the party at about 2:00 to 2:30 p.m. at which time, while walking to the parking lot, Ricard asked him to help steady some merchandise falling off Ricard's cart. At that time, Bordelon saw a yard blower fall out of a tan trash bag. However, he did not suspect it was stolen until Ricard said, "Oops, you didn't see that," and Bordelon associated Ricard's comment with his

would indicate or corroborate a theft, no witness other than the discharged employees testified affirmatively there was no yard blower on the cart pushed by plaintiff and Ricard.

knowledge that yard blowers were not offered as a prize at the party. These events led Bordelon to report the incident to George Haas, a K & B Transportation Manager, approximately ten minutes later after Bordelon retrieved his truck from the parking lot.

Regarding Bordelon's motivation to make any unfounded charges against Ricard, Bordelon testified that race had nothing "at all" to do with the argument he had earlier with Ricard, stating it was a matter of his not wanting to work for two people at the same time. He denied telling ethnic jokes, stating he was "not a joke teller." In response to questions from the Court, he also denied making any ethnic remarks. Bordelon was also interviewed by K & B during its investigation, was asked about possible "bad blood" between him and Ricard and took a polygraph test.

John Jackson, who has been with K & B for twenty-nine years and worked in warehouse return at the time of the Christmas party, left the party at the same time as plaintiff. He then returned to the party to retrieve a jacket he left behind. He did not remember seeing Laplaca or Kahrs. His testimony is significant only in that he did not report seeing anything that would corroborate Laplaca's accusation as to the theft.

Joe Colna, now Assistant to the Package Supervisor, but formerly an Order Filler at the warehouse, also departed the party around the same time as the plaintiff. The jist of his testimony was that he did not see anything suspicious corroborating the theft of the power blower, did not see a power blower, but was not interviewed prior to the termination of plaintiff and Ricard. Through Colna's testimony, plaintiff apparently hoped to raise an inference that K & B deliberately sought out evidence unfavorable to the plaintiff during the investigation. The Court rejects this contention: In response to questions posed by the Court, Colna explained he had no knowledge of the investigation, but also indicated he was never asked by either Ricard or the plaintiff to help out, even though Ricard left with Colna and presumably either Ricard

or the plaintiff would have sought Colna's testimony to exculpate them if they were in fact innocent. Colna also had no knowledge of any incidents that would motivate Laplaca and Bordelon to make false accusations against Ricard or the plaintiff.

As alluded to above, Mike Kahrs, now K & B Assistant Manager at the warehouse, was also present at the end of the Christmas party. He confirmed Laplaca told him about the power blower at the end of the party. However, he admitted to having eight to ten drinks at the party, a factor which in all probability explains why he made no inquiries regarding the theft to anyone, including the security guard, on the day of the party. He further stated he did not then interpret Laplaca's comment as an accusation of theft and he did not then know whether blowers were given as gifts, confirming this Court's assessment of his state of mind. He also testified that although packages are generally checked as people leave the warehouse, on the day of the party no one was checking packages.

The impact of Laplaca's question came home to Kahrs on the following Monday, December 30, during a conversation in the offices of Nelson Byrd, the K & B Warehouse Manager. George Haas was also present. At that moment, the witness voiced Laplaca's question about whether blowers had been given as gifts and later reported his suspicions to Lonnie Henry.

The testimony of the remaining witnesses focused upon K & B's efforts to investigate the alleged theft.

George Haas, K & B's Transportation Manager, who for seven years was responsible for shipping at the warehouse, had no firsthand knowledge of the alleged theft and his only involvement was receiving the report from Kahrs and holding brief conversations about the incident with Byrd and John Mooney, K & B Director of Distributions and Warehouse Manager. Haas denied generally any racial problems at the warehouse.

Nelson Byrd, the Labarre Warehouse Manager, testified he was told by Haas that a bag with a power blower in it fell off Ricard's cart. Byrd then called the securi-

ty guard to see if Ricard had left, intending to talk to him. However, Ricard had already departed. Byrd considered the alleged theft serious but did not report it until Monday. He did not appear to have any further significant part in the investigation or discharge but further testified plaintiff was not replaced at the warehouse.

Daryl Charles, the security guard on duty, corroborated receiving a call from Byrd on the day of the party, but Ricard had just left at the time of the call. Charles also reported seeing Ricard open his trunk, corroborating testimony to the same effect and raising an inference that the power blower may have been placed in the trunk of Ricard's car. However, Charles stated this looked normal to him.

Thomas Pickering, a K & B Vice President and Services Director, also testified regarding discussions had concerning the alleged theft, the investigation undertaken and the decision to take inventory to confirm the absence of the yard blower. Pickering confirmed receiving advices from the security officers that plaintiff was completely uncooperative, corroborating their trial testimony. He further testified the investigation into the theft here at issue was the most extensive K & B ever undertook because the two employees concerned were of such long-term tenure and had served relatively well, and because no confession was obtained. He testified he and Mooney made the decision to fire plaintiff and Ricard because of the strict stance they felt they had to take with the large numbers of items in open stock in the warehouses, leading to easy pilferage. Thus, in his opinion strong rules were needed as a deterrent.

John Mooney testified briefly to the December 30th staff meeting with Pickering, to whom Mooney reported. He further stated he never received any complaint from plaintiff about any unfair treatment during the investigation.

James Betbeze, K & B's Safety and Security Director, formerly an NOPD police sergeant and assistant chief investigator with the District Attorney's office, came to know plaintiff during the investigation into the alleged theft. The matter was brought to his attention on December 30 by Pickering, who advised merchandise was missing from the warehouse. During his investigation, Betbeze interviewed plaintiff, Ricard, Bordelon, Laplaca, Henry, Byrd and Mooney. He was also in the room with Henry during plaintiff's questioning. He confirmed plaintiff's noncooperative attitude during the interview, and further testified regarding the inventory performed by Dennis Scullin at Mooney's direction. Scullin testified briefly that his inventory showed a yard blower was missing. Betbeze spent around twenty hours personally on the investigation. He also denied there was any mention of Colna as a potential exculpatory witness during Ricard's or plaintiff's interviews.

Lonnie Henry, a former NOPD police officer with seventeen years experience, interviewed plaintiff, Bordelon, Laplaca and Ricard and spoke only briefly with Kahrs. His investigation began December 30 and he devoted about twenty-four hours to the case. He met with Mooney, Pickering and Byrd to discuss his findings. Material to this Court were his observations of plaintiff's attitude as mildly hostile; his report of plaintiff's comment that K & B could do what they want; and plaintiff's limited admission that there was a bag on top of the cart.

Plaintiff also took the stand to testify regarding the departure from the party. She denied seeing Ricard take the blower or seeing it on the cart. She testified extensively to pressure placed upon her to admit she had seen Ricard take the blower. She also testified to the coercive atmosphere of the interviews, during which she was told to open a blower box brought into the interview room, which necessitated her kneeling on the floor.

However, she stated that before this incident she was not aware of any discrimination against her nor of any problems with her supervisor or Byrd. She also admitted that during her interview by Pickering she did not tell him about Colna or what she asserted at trial was exculpatory testimony

because the box in which the blower was placed was different from any box that she had seen. She also testified to complaints she made regarding mistreatment by Henry during his interview, although these complaints were not corroborated by other trial testimony.

Were it necessary to the Court's resolution of this case, this Court would find Laplaca credible as an eyewitness to Ricard's theft of the yard blower. Laplaca was also credible in testifying that plaintiff witnessed the theft. Were it necessary to a resolution of this case, the Court would also find Laplaca credible in her witnessing the bag containing the blower falling from off the cart being used by Ricard and the plaintiff to transport their Christmas gifts and food from the party to the parking area. Were it necessary to a resolution of this case, the Court would find Bordelon credible in his testimony that the yard blower again fell out of the cart, at which time Ricard said to Bordelon, "Oops, you didn't see that."

However, what this Court finds most significant from the testimony as a whole is the reasonableness of the conduct of K & B management, demonstrated by the investigation into the alleged theft prior to discharging the plaintiff as a result of Laplaca and Bordelon's allegations. The Court further finds that Bordelon acted reasonably in discussing his suspicions with supervisory personnel Haas and Byrd and in ascertaining whether a blower was given out as a Christmas gift. Haas and Byrd also acted reasonably in calling security guard Daryl Charles at his post in the warehouse parking lot to attempt an on-the-spot resolution of Bordelon's suspicions. Byrd acted reasonably in reporting the theft to John Mooney on Monday, December 30, given the theft occurred on December 24 over the Christmas holidays.

The Court also finds that Distribution Services Director Thomas Pickering acted reasonably in initiating a formal investigation of the theft by notifying K & B security personnel Jim Betbeze and Lonnie Henry, who separately interviewed Bordelon, Laplaca, Ricard and the plaintiff. Henry also acted reasonably in speaking to Mike Kahrs informally concerning his knowledge of the theft.

The Court acknowledges that plaintiff and Ricard consistently denied the theft. However, the pertinent inquiry is whether K & B's actions in the investigation and discharge of plaintiff were reasonable or whether they were motivated by racial animus. The Court further acknowledges that of the individuals allegedly involved in the events of December 24, only the plaintiff and Ricard were black. However, the Court finds no evidence of discriminatory intent on the part of K & B, but rather finds K & B's handling of the case, resulting in the discharge of a former employee of the month, to reflect K & B's strict policies concerning suspected theft and the necessity for its deterrence. K & B's policies are reflected in the K & B Warehouse Employee Handbook, Defendant Exhibit J, which states in pertinent part:

> Warnings will ordinarily be issued so that an employee will have an opportunity to correct any conduct that violates posted rules. However, for the following offenses, an employee may be discharged without warning or notice of any kind:
>
> Insubordination.
> Destruction of property or materials.
> Drunkenness, drinking or carrying intoxicating beverages on the job.
> Stealing or other dishonesty.
> Fighting.
> Gambling.
> Refusel to perform a job assignment which does not endanger your health or safety.

The Court also finds significant the uncontradicted evidence of an inventory of yard blowers conducted by warehouse employee Dennis Scullen on December 30, 1985 at Mooney's direction. The inventory count confirms the Court's impression that K & B was not content to rely solely on a credibility determination in resolving this matter, but also sought an objective resolution of the charges made against plaintiff. K & B's endeavor to obtain some objective evidence upon which to base its decision is

further demonstrated by its causing Bordelon, Laplaca, plaintiff and Ricard to undergo polygraph examinations. This Court voices no opinion on the reliability of the findings of those tests or upon what the tests prove. However, the use of the polygraph tests by K & B supports a finding that K & B acted reasonably in its investigation, its belief of the eyewitness' account of the theft and the discharge of the plaintiff.

### Conclusions of Law

This Court has subject matter jurisdiction over this case under Title 7 of the 1964 Civil Rights Act, 42 U.S.C.A. § 2000e–2 *et seq.*[2] and 42 U.S.C. § 1981.[3] Plaintiff is thus arguing that she was fired because of her race and has asserted a cause of action under a disparate treatment theory pursuant to Title 7 of the Civil Rights Act.

The order and allocation of proof in the individual disparate treatment case was established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The elements of a case of racial discrimination as articulated in *McDonnell Douglas* and *Burdine* apply to cases under Section 1981 of Title 42 as well. *See, Crawford v. W. Elec. Co.,* 614 F.2d 1300, 1315, *reh. denied* 620 F.2d 300 (5th Cir.1980). Under *McDonnell Douglas/Burdine,* the plaintiff has an initial burden of establishing a *prima facie* case of discrimination. The plaintiff's *prima facie* case of discrimination then creates a rebuttable presumption of discrimination and shifts the burden of production, not proof, to the defendant to "articulate a legitimate, nondiscriminatory reason for discharge." *Lee v. Russell County*

*Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir. 1982). As stated by the Eleventh Circuit,

> It is well settled in employment discrimination cases such as this that for an employer to prevail [the Court] need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith *believed* plaintiff's performance to be unsatisfactory and that the asserted reason for the discharge is therefore not a mere pretext for discrimination.

*Moore v. Sears Roebuck & Co.,* 683 F.2d 1321, 1323 n. 4 (11th Cir.1982) (citations omitted) (original emphasis). Thus, the correctness of the employer's belief is not an issue: Even if the employer wrongly believed the employee to have violated its policies, if the employer acted upon such a belief, it cannot be held guilty of racial discrimination. *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1256 (5th Cir. 1977).

Other pertinent authority suggests plaintiff must show she was deprived of employment when a similarly situated white person would not have been. *See Clark v. Huntsville City Board of Education,* 717 F.2d 525, 529 n. 6 (11th Cir. 1983). Alternatively, plaintiff must show there was a difference in the severity of punishment meted out to minority employees for a given breach of company rules. *See Coleman v. Braniff Airways Inc.,* 664 F.2d 1282, 1285 (5th Cir.1982). *See also, Lerma v. Bolger,* 689 F.2d 589, 592 (5th Cir.1982). Moreover, an insolated incidence of racial discrimination, if established, does not establish a pattern or practice of employer discrimination such as would show racial animus as to an individual claim.

---

2. Title 7 of the Civil Rights Act provides in pertinent part:

> (a) It shall be an unlawful practice for an employer
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

3. 42 U.S.C. § 1981 provides in part:

> All persons within the jurisdiction of the United States shall have the right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*See Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977); *Goff v. Continental Oil Co.,* 678 F.2d 593, 597 (5th Cir.1982).

■ Applying these principles of law to this case, the Court concludes plaintiff has failed to establish a *prima facie* case of discrimination. There was no suggestion in this case that K & B's strict policies concerning theft would be or have been applied differently to whites and blacks. There is no evidence that K & B's actions were motivated by racial intent.

■ Moreover, even assuming *pro arguendo* plaintiff had made out a *prima facie* case of discrimination, K & B certainly articulated a legitimate, nondiscriminatory reason for the employee's termination, in its termination of the plaintiff based upon a good faith belief in her complicity in a theft, the occurrence of which was suggested by an objective inventory. In the Court's opinion, even if K & B were wrong in its assessment that plaintiff witnessed a theft which she failed to report, K & B has more than satisfied its burden of articulating a legitimate reason for its actions in the enforcement of company policy regarding theft.

It is indeed unfortunate that the enforcement of K & B policy in this instance worked to the detriment of an employee with a long and more than satisfactory tenure on her job. However, the evidence as a whole predominates that K & B did not take action lightly and seriously evaluated the allegations of theft before taking action. It is ironic this discrimination claim arose from a Christmas party at which both blacks and whites were present, but apparently, the festivities only encouraged the atypically light securities measures which permitted the theft to occur.

■ A final argument this Court wishes to address is plaintiff's assertion that certain Findings of Fact rendered by the Louisiana Department of Labor, Tom G. Halko, Appeals Referee, on June 30, 1986 are binding on this Court under doctrines of *res judicata* and collateral estoppel. Specifically, Halko found that Causey "was separated at the convenience of the employer and not for legal misconduct."

In support of this assertion, plaintiff relies upon *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), for the proposition that *res judicata* and collateral estoppel apply to suits initiated under 42 U.S.C. § 1981 as long as "full and fair opportunity to litigate the specific issue was afforded to the party against whom the doctrine is sought to be enforced." Plaintiff also cites a district court case from Iowa, *Gear v. City of Des Moines,* 514 F.Supp. 1218 (S.D.Iowa 1981), *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) and *Painters District Council No. 38 v. Edgewood Contracting Co.,* 416 F.2d 1081 (5th Cir.1969), for the proposition that *res judicata* and collateral estoppel apply to decisions of administrative agencies acting in a judicial capacity. Lastly, plaintiff asserts the decision of the Department of Labor is binding upon this Court under LSA–R.S. 23:1632, which provides that the department's decisions are "conclusive for all purposes of this Chapter as between the administrator, the claimant, and all employing units...."

The decision of the Appeals Referee was made a part of the record of this Court as Plaintiff Exhibit I.[4] The issue presented for resolution as reflected by the decision of the Appeals Referee is the viability of plaintiff's disqualification for benefits under LSA–R.S. 23:1601(2). After setting forth the duty of the employer in this context to prove the acts of disqualifying misconduct connected with the claimant's employment, the Appeals Referee concluded there was insufficient evidence to substan-

---

**4.** Also introduced into evidence as Plaintiff Exhibit II was the decision of the Board of Review mailed April 4, 1986, reinstating plaintiff's workmen's compensation benefits. The decision of the Appeals Referee reflects the April 4 decision was appealed and the matter subsequently remanded to the Appeals Referee to schedule another hearing. Accordingly, the final disposition in the matter appears to be the decision of the Appeals Referee mailed June 30, 1986, Exhibit I.

tiate legal misconduct and that the claimant would be given the benefit of the doubt. Accordingly, plaintiff's disqualification for unemployment compensation was removed.

The final decision of the Appeals Referee demonstrates the issues before it were wholly distinct from those before this Court. The focal issue before this Court, as stated previously, is whether the defendant acted reasonably in terminating the plaintiff, not whether the defendant was right or wrong in its decision. By contrast, the focal issue before the Department of Labor was whether the defendant could sustain its burden of establishing legal misconduct connected with plaintiff's discharge, which issue bears upon whether the defendant was correct in its decision to terminate the plaintiff. For these reasons, there is no identity of issues such as would bind this Court and require the outcome of this particular case to be favorable to the plaintiff.

Moreover, assuming the doctrines of collateral estoppel or *res judicata* apply the decisions of the Department of Labor, this Court's decision would not be affected by a conclusive finding that defendant was wrong in terminating the plaintiff.

In any event, the Court does not find the legal authorities cited by the plaintiff require application of the doctrine of collateral estoppel to the Department of Labor's findings. First, the Louisiana Revised Statutes expressly provide that the Department of Labor's determination is conclusive only "for purposes of this Chapter," referring to Chapter 11, entitled "Unemployment Compensation," of Title 23 of the Louisiana Revised Statutes, entitled "Labor and Worker's Compensation." Thus, in the Court's opinion, Section 23:1632 of the Revised Statutes does not require this Court to defer to the decision of the State Department of Labor in resolving a federal claim.

The decisions in *Utah Construction & Mining Co.* and *Edgewood Contracting Co.* cited above concern the binding effect of Board of Contract Appeals and NLRB findings and are thus deemed to be distinguishable by this Court. Moreover, this Court is not bound by the decisions of another district court, and for that reason need not follow *Gear v. City of Des Moines* cited above.

The most compelling authority cited by plaintiff on the collateral estoppel/*res judicata* issue is *Allen v. McCurry*, wherein the Supreme Court held that collateral estoppel applied to a state criminal court's determination regarding the constitutionality of a search and seizure, so as to require dismissal of a plaintiff's federal suit under the Civil Rights Act for the same alleged unconstitutional search and seizure. However, applying *Allen* to this case does not lead this Court to the conclusion that collateral estoppel and *res judicata* principles should be here applied: First, there is no suggestion that the Louisiana Department of Labor attempted to give the parties "a full and fair opportunity" to litigate any *federal* claims, 449 U.S. at 105, 101 S.Ct. at 420; second, *Allen* concerned the preclusive effect of a prior state court judgment, rather than the admittedly "quasi judicial" hearing by the Louisiana Department of Labor; third, as previously indicated, the issues before the Department of Labor are distinct from those before this Court; and lastly, *Allen* expressly concerns the issue whether "collateral estoppel applies when Section 1983 plaintiffs attempt to relitigate in federal court issues decided *against* them in state criminal proceedings." *Id.* at 103, 101 S.Ct. at 419.

Thus, plaintiff's Title 7 and Section 1983 claims should be dismissed. Plaintiff's claims for intentional tort and defamation were dismissed on motion for involuntary dismissal at the close of plaintiff's case. The Court found no evidence whatsoever of an intentional tort. Moreover, the evidence predominated that the investigation of plaintiff's case was handled appropriately with reasonable discretion and without any undue publication. The Court also opined there was no damage shown from defamation, nor did plaintiff maintain her burden of establishing that any statements relating to the theft were false.

For the foregoing reasons, the Court concludes that the plaintiff's claims against K

& B Inc. should be DISMISSED with prejudice, and the Clerk of Court is hereby directed to enter Judgment in favor of the defendant, dismissing plaintiff's claims with prejudice, plaintiffs to bear all costs.[5]

---

[5.] Notwithstanding the Court's dismissal of plaintiff's claims, this Court does not find plaintiff's action to be so frivolous, unreasonable or without foundation so as to require the award of attorney's fees to the prevailing defendant, and the Court exercises its discretion to deny such fees. *See Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). However, costs in Title VII cases may be awarded to a prevailing defendant even when not entitled to attorney's fees. *See Jones v. City of San Antonio,* 568 F.2d 1224 (5th Cir.1978). The same standards applied to an award for attorney's fees in a Section 1981 case under 42 U.S.C. § 1988. *See Harbulak v. County of Suffolk,* 654 F.2d 194 (2d Cir.1981).