**PUFF 'N STUFF OF WINTER PARK, INC., Glenn F. Dietel, Christine B. Dietel, Barbara E. O'Brien and Warren Dietel, Plaintiffs,**

v.

**FEDERAL TRUST BANK, F.S.B., Federal Trust Corporation, James T. Bell and Daniel W. Lykens, Defendants.**

No. 95–637–CIV–ORL–18.

United States District Court,
M.D. Florida,
Orlando Division.

Nov. 8, 1996.

David L. Fleming, Law Office of David L. Fleming, Gulf Breeze, FL, for plaintiffs.

Eli H. Subin, Subin, Rosenbluth, Losey, Brennan, Bittman & Morse, P.A., Orlando, FL, for defendants.

Karen Bruton, Office of Thrift Supervision, Regional Counsel, Atlanta, GA, for movant.

## ORDER

G. KENDALL SHARP, District Judge.

Plaintiffs bring this action against the defendants claiming violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, codified at 18 U.S.C. §§ 1961–1965, based upon an alleged pattern of bank and mail fraud in connection with a series of commercial loans. In 1994, the loans became the subject of foreclosure actions filed against the instant plaintiffs in state court. In the same year, plaintiffs sought the protection of the United States Bankruptcy Court. Plaintiffs filed the instant action on June 22, 1995. The case is presently before the court on defendants' motion for summary judgment, to which plaintiffs have responded in opposition. Defendants contend, *inter alia*, that they are entitled to judgment as a matter of law in the instant case on procedural grounds. Having now reviewed the case file and relevant law, the court concludes that defendants' motion should be granted.

### I. Findings of Fact

Plaintiff Puff 'N Stuff of Winter Park, Inc. (PNS) is a Florida corporation with its principal place of business in Winter Park, Florida. PNS operates a catering and banquet business. Plaintiffs Glenn and Christine Dietel (the Dietels) are husband and wife and are the sole shareholders and directors of PNS. Plaintiff Warren Dietel is the Dietels' son, while plaintiff Barbara E. O'Brien (O'Brien) is Christine Dietel's mother.

Defendant Federal Trust Bank, F.S.B. (Federal Trust) is a federal savings bank organized under the laws of the United States and supervised by the federal Office of Thrift Supervision. Defendant James T. Bell (Bell) founded Federal Trust and served as its chief executive officer at all times relevant to this litigation. Defendant Daniel W. Lykens (Lykens) was at all relevant times the vice president of Federal Trust and was personally involved with the plaintiffs on behalf of Federal Trust.

The incidents that eventually spawned this lawsuit began in mid–1990 when the Dietels sought financing to fund an expansion of their catering business. The Dietels planned to purchase certain property on Forsyth Road in Winter Park, Florida and construct a banquet hall on the site.

In July of 1990, a PNS representative met Bell while soliciting the catering contract for Federal Trust's grand opening. When Bell discovered that PNS had expansion plans, he sought to have Federal Trust provide the financing PNS needed. At that time, PNS had already been approved for a loan through another lender. After being apprised of the Dietel's financing needs,[1] Bell apparently represented that he "was the bank" for all practical purposes and that the Dietels would have no difficulty in obtaining their needed financing. Even though Bell informed the Dietels of Federal Trust's lending limit of $600,000 per borrower, he explained that several upcoming events would put Federal Trust in a position to increase the loan limit per borrower and allow it to fully fund the PNS expansion. In short, Bell answered the Dietels' several concerns by assuring them that, regardless of the contingency, Federal Trust would always be able to "work something out" to satisfy their borrowing needs.

The Dietels claim that Bell was fully aware of their personal financial condition and that of PNS. They also claim that Bell knew that the timing of the loan disbursements by Federal Trust would be crucial to the expansion project's success, and their ability to meet business commitments to be made in reliance on the loan and the expectation of their new facility being completed on time.

After the Dietels agreed to allow Federal Trust to handle their financing needs, Bell introduced them to Lykens who handled the acquisition loan for the Forsyth Road property. The loan and purchase of the property closed on October 20, 1990. The Dietels claim that Lykens reviewed plans for the remodeling and either approved them or made suggested alterations on behalf of Federal Trust. Lykens also helped the Dietels select the contractor for the expansion and renovations.

The Dietels secured their building permit on July 30, 1991, and construction began. The Dietels claim that both Bell and Lykens fully committed, on behalf of Federal Trust, to providing the funding necessary to complete the construction project and never indicated any reservations about Federal Trust's ability to do so. Federal Trust paid the first draw request from the Dietel's contractor in the amount of $55,753.83. When the second request came in the amount of $39,106.35, Lykens allegedly instructed Federal Trust employees to inform the Dietels and PNS that it was unable to pay the draw because the payment would cause Federal Trust to exceed its per-borrower lending limit.

Because Federal Trust refused to pay the second draw request, the construction company halted its work on the expansion project. The stoppage allowed the unfinished portion of the job to be exposed to the elements and caused the overall project to be delayed. The delay in turn prevented PNS from fulfilling business commitments it made in anticipation of the project's timely completion. The Dietels claim this damaged PNS's business reputation in the community.

To remedy this situation, in September of 1991, Bell and Lykens suggested an additional loan be made for the benefit of PNS but in the name of John and Barbara O'Brien, Christine Dietel's parents. This was admittedly to circumvent Federal Trust's lending limit per borrower. The Dietels originally resisted this solution as they did not want to involve Christine's aging parents. But in October of 1991, at the insistence of Bell and Lykens, the Dietels grudgingly agreed to pledge all their remaining assets as collateral to secure a nonrecourse loan in the O'Briens' name. The O'Briens were also made to post collateral before Federal Trust would agree to close the loan.

Finding that the loan in the O'Briens' name was still not enough to complete the expansion.

---

1. The Dietels indicated that they and PNS would need at least $1,025,000 to complete the desired

job, Federal Trust made another loan to the O'Briens, allegedly over the Dietels objection, in the amount of $110,000 for which the O'Briens pledged their home as collateral. Another loan was then made to the Dietels son, Warren, again allegedly over the Dietels' objection. Even after the additional loans to the O'Briens and Warren Dietel for the benefit of PNS, the project nonetheless lacked adequate funding because of cost overruns and delays allegedly caused by Federal Trust's failure to fund the original loan as agreed.

In early 1992, a portion of the money advanced to the Dietels and PNS was repaid by way of a $700,000 loan from another bank, Bay Bank. Lykens allegedly engineered this loan and induced the Dietels to comply by promising a $45,000 credit line for operating expenses and by promising to release the property pledged by the O'Briens as collateral, including their home. The Dietels entered this loan arrangement, from which $643,000 was paid to Federal Trust to pay down prior advances. Notwithstanding its representations however, Federal Trust allegedly refused to extend the promised line of credit and refused to release the mortgage on the O'Briens' home. In making such allegations, the plaintiffs claim that Federal Trust acted in a malicious manner throughout the latter stages of their relationship. This malice, the Dietels contend, damaged their personal and business reputation and that of PNS.

The Dietels contend that the abovementioned acts of Federal Trust, through Bell and Lykens, constitute bank fraud. They further contend that Federal Trust and the individual defendants utilized the United States mails in the purposeful furtherance of their bank fraud. Thus, plaintiffs contend that the latter constitutes mail fraud which, together with their allegations of bank fraud, support their instant claim under the RICO statute.

In 1994, Federal Trust filed foreclosure actions in Florida state court against each of the plaintiffs in the instant case. In the foreclosure actions, the Dietels and PNS filed counterclaims against Federal Trust and the other defendants presently at bar, alleging a variety of business-related torts but not a civil RICO action. Although Federal Trust filed a foreclosure action against O'Brien and Warren Dietel, neither responded with counterclaims. The abovestated facts are undisputed as they relate to the court's review of Federal Trust's motion.

## II. Legal Discussion

Plaintiffs bring the instant action pursuant to the federal RICO statute, codified at 18 U.S.C. §§ 1961–65, alleging a pattern of bank and mail fraud as the requisite predicate acts. Defendants have filed a motion for summary judgment based upon several legal arguments, to which plaintiffs have responded in opposition. After setting forth the standard by which motions for summary judgment are reviewed, the court will address the issues which convince the court that defendants' motion should be granted.

### A. Legal Standard for Summary Judgment

Summary judgment is authorized if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Material facts are those that may affect the outcome of the case under the applicable substantive law. Disputed issues of material fact preclude the entry of summary judgment; but factual disputes that are irrelevant or unnecessary will not be counted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

The moving party bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14; *see Matsushita Elec. Indus. v. Ze-*

*nith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). The moving party may rely solely on its pleadings to satisfy this burden. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53; Fed.R.Civ.P. 56(c). However, the non-moving party that bears the burden of proof at trial must go beyond the pleadings and submit affidavits, depositions, answers to interrogatories, or admissions that designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)). The district court's function at the summary judgment stage is not to weigh the quality of the evidence submitted in support of and in opposition to the motion for summary judgment. Rather, the court is charged only with the duty of determining whether the record, when evaluated against the background of Rule 56, presents a material factual dispute requiring a trial for resolution. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

*B. The Merits of Defendants' Motion*

The defendants' memorandum in support of their motion for summary judgment sets forth four legal arguments in support of their position. One argument is that the plaintiffs' instant claim is barred in this court because it is predicated upon the same operative facts as the state foreclosure actions pursued in 1994. As such, Federal Trust and the other defendants at bar contend that the civil RICO action presently before the court should have been pressed in state court as a compulsory counterclaim and, therefore, is now barred by the doctrine of *res judicata* and Florida's compulsory counterclaim rule. Plaintiffs retort claiming that their RICO claim would have been nothing more than a

permissive counterclaim in state court and is, therefore, not presently barred. The court must disagree.

*1. The Foreclosure Action Against PNS and the Dietels*

■ In Federal Trust's state foreclosure action, PNS and the Dietels advanced a counterclaim for various business-related torts, but not civil RICO. In their four-count counterclaim, PNS and the Dietels set forth claims for fraud, breach of fiduciary duty, negligent misrepresentation, and promissory estoppel. The factual allegations made to support the state counterclaim, filed in the state court on May 11, 1994, match those in the instant case almost verbatim. The only difference between the allegations in the state court counterclaim and the claim presently at bar is the absence in the state court of the allegations relating to mail fraud. However, of the 23 mailings plaintiffs list in their complaint to support mail fraud as a predicate act, all but one bear dates between 1990 and 1992, two years before the foreclosure action was filed.[2]

While plaintiffs ground their RICO claim upon bank fraud as well as mail fraud, the allegations that support their theory of bank fraud as a predicate act are no different than the allegations plaintiffs relied upon in their state court counterclaim as grounds for the four claims they stated, save the fact that plaintiffs' counterclaim was for common law fraud as opposed to bank fraud.[3] On December 14, 1994, the state trial judge who presided over Federal Trust's foreclosure action issued a final judgment in favor of Federal Trust, Bell, and Lykens, among others, on the counterclaim filed by PNS and the Dietels.

**2.** Although plaintiffs claim that the listed mailings are "neither exhaustive nor all inclusive," the pattern of mail fraud they allege was sufficiently developed in 1994 so that the allegations could have been included in their counterclaim. Thus, the court finds that plaintiffs' RICO claim was an "admissible matter that might have been offered" to sustain their counterclaim. *See Commissioner of Internal Revenue v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). If courts were to allow plaintiffs' "continuing in nature" argument, there would be no objective point at which allegations of pattern, predicate

acts would mature into a cognizable RICO claim. Congress specifically defined the requisite pattern as "at least two acts of racketeering activity." 18 U.S.C. § 1961(5) (1994). Under this definition and the facts alleged, plaintiffs had more than enough of a pattern of mail fraud to have brought this action in their state counterclaim.

**3.** Hence, the court finds that the difference between plaintiffs' state counterclaim and the instant RICO claim is all but entirely semantic.

"When a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter that might have been offered for that purpose.'" *Sunnen,* 333 U.S. at 597, 68 S.Ct. at 719 (quoting *Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1876)); *see also Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980). Final state court judgments are accorded the same preclusive effect in federal court as they are due in the courts of the state in which the judgment was rendered. *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 83, 104 S.Ct. 892, 897, 79 L.Ed.2d 56 (1984).

Thus, in determining the preclusive effect of the final judgment against PNS and the Dietels, the court must apply Florida's law on this issue. There are four prerequisites which must be satisfied before preclusive effect can attach to a final judgment under Florida law: "(1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the quality in the person for or against whom the complaint is made." *Adams v. Sewell,* 946 F.2d 757, 762 (11th Cir.1991), *overruled on other grounds by McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994).

As to the first element, the court finds that PNS and the Dietels seek the same relief at bar as was sought in their counterclaim in state court. Specifically, as to each count in the counterclaim, PNS and the Dietels sought "damages, pre-judgment interest, post-judgment interest, costs, attorney's fees and such other relief as the Court may deem just and proper." In the instant case, plaintiffs "demand judgment against the defendants for three times their damages and for their costs, including attorney's fees, and further pray for such other and further relief, including injunctive relief and cancellation of instruments, as may be needed, both during and at the conclusion of this case, to afford complete relief to the plaintiffs." Although the plaintiffs in the instant case specifically request "three times their damages" and "injunctive relief," both of those remedies are expressly provided under the RICO statute and are not exclusively available in federal court. *See Tafflin v. Levitt,* 493 U.S. 455, 460–61, 110 S.Ct. 792, 795–96, 107 L.Ed.2d 887 (1990) (holding that federal jurisdiction over RICO claims is concurrent and not exclusive). Consequently, had the RICO claim been part of plaintiffs' counterclaim, this relief would certainly have been requested.

Simply because some remedies sought in the instant case are different from those sought in state court does not impede the operation of claim preclusion presently. *See generally Benline v. City of Deland,* 731 F.Supp. 464, 466–68 (M.D.Fla.1989), *aff'd,* 897 F.2d 1127 (11th Cir.1990) (citations omitted); *see also Martinez v. California,* 444 U.S. 277, 283, 100 S.Ct. 553, 558, 62 L.Ed.2d 481 (1980). Regardless, the court finds that the slight differences in the respective prayers for relief are made even more slight by the fact that in each action plaintiff specifically requests that the court assess whatever relief it finds just and appropriate in addition to the specific request for money damages. Still further, any difference in "the thing sued for" is far overshadowed by the fact that the factual allegations in the case at bar are all but copied from the pleading filed and adjudicated in 1994. As such, the court finds that the first element of test for claim preclusion is satisfied.

The second element of claim preclusion presents the question of whether the cause of action that was the subject of the previously issued judgment is the same as the one presently before the court. In answering this question, the court must evaluate the substance of the two actions and not simply their form. *I.A. Durbin, Inc. v. Jefferson Nat'l Bank,* 793 F.2d 1541, 1549 (11th Cir.1986); *see also Albrecht v. State,* 444 So.2d 8, 12 (Fla.1984). In essence, "if a case arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action, [then] the two cases are really the same 'claim' or 'cause of action' for purposes of [claim preclusion]." *Citibank, N.A. v. Data Lease Fin. Corp.,* 904 F.2d 1498, 1503 (11th Cir.1990) (quoting *Ru-*

*ple v. City of Vermillion, S.D.,* 714 F.2d 860, 861 (8th Cir.1983), *cert. denied,* 465 U.S. 1029, 104 S.Ct. 1290, 79 L.Ed.2d 692 (1984)); *see also In re Justice Oaks II, Ltd.,* 898 F.2d 1544, 1551 (11th Cir.), *cert. denied,* 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990) (acknowledging Florida's adoption of the "transactional" test set forth in Restatement (2d) of Judgments § 24 (1982)). Applying these rules, it is clear that the counterclaims to the state foreclosure action and the RICO action at bar share an identical nucleus of operative fact. As such the court finds that the second element of the test for claim preclusion is satisfied. Finally, the parties do not dispute the fact that the relevant parties to the instant case were also parties to Federal Trust's foreclosure action which gave rise to the state court counterclaim in question. Similarly, the parties do not contend that the quality or nature of each party's interest in the instant case is different than in the foreclosure action and the counterclaim thereto. As such the court finds no impediment to finding elements three and four of the test for claim preclusion satisfied in the case at bar. Thus, the doctrine of claim preclusion bars the instant RICO claim as stated by PNS and the Dietels.

■ Notwithstanding the fact that the factual basis for the instant RICO claim has previously been before a court of competent jurisdiction and been rejected on its merits, albeit under an admittedly different technical guise, there exists a separate basis for granting Federal Trust's motion for summary judgment in the case at bar. Florida's compulsory counter claim rule bars the instant RICO claim because it is most decidedly a compulsory counterclaim which should have been presented to the state trial court along with the other counterclaims advanced there.

■ The Florida rule of civil procedure dealing with compulsory counterclaims tracks the corresponding federal rule. That rule, Rule 13(a) of the Federal Rules of Civil Procedure, provides in relevant part that:

A pleading shall state as a counterclaim any claim which at that time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties [over] whom the court cannot acquire jurisdiction.

Fed.R.Civ.P. 13(a) (West 1996). Applying this standard, Florida courts have long held that a compulsory counterclaim is a defendant's cause of action "arising out of the transaction or occurrence that formed the subject matter of the plaintiff's claim." *E.g., Yost v. American Nat'l Bank,* 570 So.2d 350, 352 (Fla.Dist.Ct.App.1990) (citing *City of Mascotte v. Florida Mun. Liab. Self Insurers Program,* 444 So.2d 965, 966 (Fla.Dist.Ct. App.1983), *rev. denied,* 451 So.2d 847 (Fla. 1984)). A similarly longstanding axiom is that the compulsory counterclaim rule is designed to foreclose the possibility of duplicative litigation. Hence, Florida courts encourage a "broad, realistic interpretation" of the rule that allows the rule to accomplish its goal. *Montgomery Ward Dev. Corp. v. Juster,* 932 F.2d 1378, 1381 (11th Cir.1991) (quoting *Stone v. Pembroke Lakes Trailer Park, Inc.,* 268 So.2d 400, 402 (Fla.Dist.Ct.App. 1972)). If the court determines as a matter of law that a counterclaim is compulsory in nature, a party's failure to raise the counterclaim in earlier litigation constitutes a waiver of the claim. *Yost,* 570 So.2d at 352; *see also Republic Health v. Lifemark Hosps. of Fla.,* 755 F.2d 1453, 1454 (11th Cir.1985) (holding that the determination of whether a counterclaim is compulsory is made as a matter of law).

■ Florida courts use a "transaction or occurrence" test to determine whether a counterclaim is compulsory:

(1) Are the issues of fact and law raised by the claim and counterclaim largely the same?

(2) Would *res judicata* bar the subsequent suit on defendant's claim absent the compulsory counterclaim rule?

(3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?

(4) Is there any "logical relationship" between the claim and the counterclaim?

*Mascotte,* 444 So.2d at 966. If any of these transaction-or-occurrence test questions is

answered in the affirmative, the counterclaim in question is compulsory in nature. *Montgomery,* 932 F.2d at 1381 (citing *Roberts v. National Sch. of Radio & Television Broadcasting,* 374 F.Supp. 1266, 1270 (N.D.Ga. 1974)). "[S]ince every compulsory counterclaim must necessarily pass the 'logical relationship' test," the court will proceed directly to that element of the analysis even though the foregoing discussion strongly suggests that Federal Trust's foreclosure action and the resulting counterclaim would satisfy the other elements of the analysis as well. *Montgomery,* 932 F.2d at 1381.

 "A claim has a 'logical relationship' to the original claim if it arises out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant." *Id.* (quoting *Neil v. South Fla. Auto Painters, Inc.,* 397 So.2d 1160, 1164 (Fla.Dist.Ct.App.1981)). The *Montgomery* court also notes that Florida courts have broadly construed the aggregate operative facts that may serve as a basis for both claims. *Id.* at 1381. With these rules in mind, and for the reasons discussed in reference to the claim preclusion issue, the court has no difficulty holding that plaintiffs' instant RICO claim springs from the same common nucleus of operative fact and, for that reason, bears a substantial logical relationship to Federal Trust's foreclosure action and the resulting counterclaims.

Indeed, Federal Trust's foreclosure action was to collect on the very loans which plaintiffs now claim are the result of Federal Trust's alleged racketeering activity. Had PNS and the Dietels prevailed in state court, the loans on which Federal Trust sought foreclosure could have been rendered illegal and unenforceable which leads logically to the conclusion that the RICO claim is a compulsory counterclaim that should have been presented to the state trial court and is, therefore, barred here.

## 2. The Foreclosure Action Against O'Brien and Warren Dietel

In actions separate from the one against PNS and the Dietels, Federal Trust brought state foreclosure actions against Warren Dietel and O'Brien. In answering the foreclosure action, both Warren Dietel and O'Brien contended that it was understood among the parties that the loans were for the benefit of PNS and the Dietels, even though the loans were made in the names of O'Brien and Warren Dietel respectively and were made solely to circumvent the per-borrower lending limit. While neither pressed counterclaims in conjunction with their answer, it is clear from the foregoing analysis that the RICO claim they now bring here is a compulsory counterclaim to the foreclosure actions pending against them in state court. Accordingly, and without rehashing the reasoning above, the court finds plaintiffs may not maintain their RICO claim here.

### III. Conclusion

Based upon the foregoing analysis, the court concludes that plaintiffs' instant RICO action is essentially a recapitulation of their counterclaim to Federal Trust's foreclosure action. The state trial court issued a final judgment against PNS and the Dietels on the counterclaim. As such, the doctrine of claim preclusion prohibits PNS and the Dietels from recasting the counterclaim as a RICO action in this court. To the extent that plaintiffs allege facts and legal theories different than those advanced in state court, the court nevertheless finds the instant action arises from the same nucleus of operative fact upon which the state counterclaim was grounded. As such, the plaintiffs' claim constitutes a compulsory counterclaim to Federal Trust's foreclosure actions. Florida's compulsory counterclaim rule, therefore, bars the prosecution of that claim here by any of the instant plaintiffs. Consequently, having found no disputed issues of material fact requiring trial for resolution, the court finds that defendants are entitled to judgment as a matter of law on plaintiffs' instant claim. Accordingly, the court **GRANTS** Federal Trust's motion for summary judgment (Doc.

1532

70) and instructs the clerk of court to enter the appropriate judgment.